Terry R. Miller
millerte@sec.gov
Securities and Exchange Commission
Byron G. Rogers Federal Building
1961 Stout Street, Suite 1700
Denver, Colorado 80294
Tel.: 303-844-1000
*Attorney for Plaintiff United States Securities and Exchange Commission*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF UTAH**

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

JASON R. ANDERSON, SCHAD BRANNON, ROYDON NELSON, BLOX LENDING, LLC, DIGITAL LICENSING, INC.,

Defendants,

and

BUSINESS FUNDING SOLUTIONS, LLC,

Relief Defendant.

**COMPLAINT**

**JURY DEMANDED**

Case No. 2:26-cv-1066

# Table of Contents


INTRODUCTION ........ 1

DEFENDANTS AND RELIEF DEFENDANT ........ 5

JURISDICTION AND VENUE ........ 7

I. BACKGROUND ........ 7

A. The Formation and Structure of DEBT Box ........ 7

B. DEBT Box Received Over $161 Million from Investors through the Sale of Over $200 Million Worth of Securities in the Form of License Agreements. ........ 10

C. How DEBT Box's Project-Specific License Agreements and Tokens Worked ........ 14

1. Background on Crypto Assets and Crypto Asset Networks ........ 14

2. Investors Bought Project-Specific License Agreements and Received Project-Specific Tokens. ........ 16

D. How Project-Specific Tokens Were Valued ........ 18

1. Background on Crypto Asset Trading Platforms ........ 18

2. Anderson and Blox Created DEBT Box Liquidity Pools. ........ 18

3. The Value of DEBT and Each Project-Specific Token were Determined in Liquidity Pools. ........ 20

II. DEBT BOX'S PROJECT-SPECIFIC LICENSE AGREEMENTS ARE SECURITIES AND WERE OFFERED AND SOLD USING INSTRUMENTALITIES OF INTERSTATE COMMERCE. ........ 22

A. Investors Bought DEBT Box License Agreements as Investments Expecting to Profit. ........ 23

B. Investors Expected to Profit from the Ongoing Managerial Efforts of DEBT Box, including Anderson, Brannon, Nelson, Blox, and DLI. ........ 28

1. "*We are a royalty acquisition company.*" - Representations About Managerial Efforts to Create Profits ........ 29

2. Representations about Ongoing Managerial Efforts to Create Profits After the Sale of Project-Specific License Agreements ........ 32

C. DEBT Box Offered and DLI Sold Investment Contracts Using Instrumentalities of Interstate Commerce. ........ 35

III. ANDERSON AND BLOX MADE MATERIALLY FALSE AND MISLEADING STATEMENTS IN VIOLATION OF SECURITIES ACT SECTION 17(a)(2) AND EXCHANGE ACT SECTION 10(b) AND RULE 10b-5(b) (CLAIMS I & III). .... 35

A. The Anderson Defendants Made Statements on the Websites, in the Lite Papers, and in the Email Updates. .... 36

B. The Anderson Defendants Made Materially False and Misleading Statements that Royalties Were Used to Buy and Burn BGLD. .... 37

C. The Anderson Defendants Made Materially False and Misleading Statements that Royalties Were Used to Buy and Burn Other Project-Specific Tokens. .... 41

1. Anderson Made Materially False and Misleading Oral Statements that Royalties Were Used to Buy and Burn Project-Specific Tokens. .... 41

2. NATG - The Anderson Defendants Made Materially False and Misleading Statements that Royalties Were Used to Buy and Burn NATG. .... 43

3. ALUM - The Anderson Defendants Made Materially False and Misleading Statements that Royalties Were Used to Buy and Burn ALUM. .... 44

4. XPLR - The Anderson Defendants Made Materially False and Misleading Statements that Royalties Were Used to Buy and Burn XPLR. .... 46

5. GROW - The Anderson Defendants Made Materially False and Misleading Statements that Royalties Were Used to Buy and Burn GROW. .... 47

6. BEV - The Anderson Defendants Made Materially False and Misleading Statements that Royalties Were Used to Buy and Burn BEV. .... 48

7. BLOX - The Anderson Defendants Made Materially False and Misleading Statements that Royalties Were Used to Buy and Burn BLOX. .... 50

8. DRIP - The Anderson Defendants Made Materially False and Misleading Statements that Royalties Were Used to Buy and Burn DRIP. .... 51

9. DCM - The Anderson Defendants Made Materially False and Misleading Statements that Royalties Were Used to Buy and Burn DCM. .... 51

10. REV - The Anderson Defendants Made Materially False and Misleading Statements that Royalties Were Used to Buy and Burn REV. .......... 53

11. The Statements About Revenue for Specific Projects Enumerated Above Were False and Misleading, Made with Scienter and Negligently, and Material. .......... 54

D. The Anderson Defendants Obtained Money or Property, Directly or Indirectly, By Means of Materially False and Misleading Statements Alleged Above that Royalties Were Used to Buy and Burn DEBT Box Tokens. .......... 56

IV. THE DLI DEFENDANTS OBTAINED MONEY OR PROPERTY BY MEANS OF FALSE AND MISLEADING STATEMENTS IN VIOLATION OF SECURITIES ACT SECTION 17(a)(2) (CLAIM III). .......... 57

A. The DLI Defendants Negligently Obtained Money or Property By Means of Materially False and Misleading Statements that Royalties Were Used To Buy and Burn Project-Specific Tokens. .......... 57

B. Brannon and DLI Negligently Obtained Money or Property By Means of Materially False and Misleading Statements About Explore (XPLR) Technology. .......... 58

V. DEFENDANTS ENGAGED IN ADDITIONAL FRAUDULENT AND DECEPTIVE ACTS IN FURTHERANCE OF THEIR DECEPTIVE SCHEME IN VIOLATION OF EXCHANGE ACT SECTION 10(b) AND RULES 10b-5(a) AND (c) (CLAIM I - ANDERSON DEFENDANTS) AND SECURITIES ACT SECTIONS 17(a)(1) (CLAIM II – ANDERSON DEFENDANTS) AND 17(a)(3) (CLAIM III – ALL DEFENDANTS). .......... 61

A. Anderson and Blox Misused $101 Million of Investor Funds to Create the Illusion of Revenue, Redeem Investors, and Prop Up the Price of Tokens in Violation of Section 10(b) and Rules 10b-5(a) and (c) of the Exchange Act and Sections 17(a)(1) and (3) of the Securities Act. .......... 61

1. Anderson misused investor funds disguised as revenue. .......... 62

2. Anderson and Blox Propped Up the Price of DEBT and Project-Specific tokens. .......... 66

3. The Anderson Defendants Misused Investor Proceeds by Commingling Proceeds from the Sale of License Agreements in Separate Projects. .......... 70

B. Anderson and Blox Deceptively Obtained Controlling Amounts of DEBT and BGLD on a Preferential Basis Not Available to Investors in Violation of Section 10(b) and Rules 10b-5(a) and (c) of the Exchange Act and Sections 17(a)(1) and (3) of the Securities Act. .......... 71

C. The DLI Defendants Misused Investor Proceeds to Pay Third-Party Companies, Which Had No Obligations to Pay Royalties to DEBT Box, in Violation of Section 17(a)(3) of the Securities Act. .................... 76

D. Brannon and DLI Failed to Correct False and Misleading Statements Alleged Above in Certain Lite Papers that Brannon Helped Prepare in Violation of Section 17(a)(3) of the Securities Act. ............................................ 77

E. Nelson and DLI Disseminated False and Misleading Statements in Violation of Section 17(a)(3) of the Securities Act. ............................................ 81

F. Nelson and DLI Propped Up the Price of DLG in Violation of Section 17(a)(3) of the Securities Act. ................................................................... 81

VI. RELIEF DEFENDANT RECEIVED PROCEEDS FROM DEFENDANTS' FRAUD TO WHICH IT HAS NO LEGITIMATE CLAIM (CLAIM IV)....................... 82

CLAIMS FOR RELIEF ........................................................................................... 82

First Claim for Relief ........................................................................................ 82

Second Claim for Relief...................................................................................... 83

Third Claim for Relief ........................................................................................ 84

Fourth Claim for Relief....................................................................................... 84

PRAYER FOR RELIEF ........................................................................................... 85

JURY DEMAND ...................................................................................................... 87

Plaintiff, United States Securities and Exchange Commission, alleges as follows against Defendants Jason R. Anderson, Schad Brannon, Roydon Nelson, Blox Lending, LLC ("Blox"), Digital Licensing, Inc. ("DLI"), and Relief Defendant Business Funding Solutions, LLC ("Business Funding"). This Complaint uses the following to refer to groups of Defendants: Anderson and Blox are, collectively, the "Anderson Defendants"; Brannon, Nelson, and DLI are, collectively, the "DLI Defendants"; and Blox and DLI as joint venture partners d/b/a DEBT Box are, collectively, "DEBT Box."

## INTRODUCTION

1. This case arises from an offering fraud. Between November 2021 and August 2023 ("Relevant Period"), Defendants made false and misleading statements to investors about supposed revenue from various lines of business to raise over $200 million from over 100,000 investors.

2. Joint venture partners Blox and DLI, and their principals Anderson, Brannon, and Nelson, worked under the brand "DEBT Box" to sell investments that would supposedly profit from revenue generated from what DEBT Box called the "physical production" of commodities in "real-world" projects. Contrary to statements made to solicit those investor funds, DEBT Box never received revenue from any such projects.

3. To bolster their promotion of these investments and prolong this fraud, the Anderson Defendants created the illusion of revenue from real-world projects by disguising over $101 million of funds that investors paid for investments as supposed revenue and used those funds as the primary source of funds available to redeem investors.

4. This use of investor funds had the purpose and effect of Ponzi payments. Unbeknownst to investors, revenue was not the source of funds DEBT Box was using to redeem investors. To fill the void of revenue and to redeem investors, the Anderson Defendants intended to use, and did use, proceeds from the sale of investments.

5. To further bolster their promotion of these investments and prolong this fraud, the Anderson Defendants also engaged in other deceptive conduct, including manipulating the price of crypto assets issued by DEBT Box to mask the absence of revenue and to make the offered investment appear more attractive.

6. During the fraud, DEBT Box marketed and offered securities in the form of investment contracts, while DLI was the entity that sold those securities. During the Relevant Period, DEBT Box generated at least $200 million in sales of securities, from which it received about $161 million of investor funds from over 100,000 investors, with the difference paid as commissions to promoters.

7. DEBT Box offered and DLI sold these investment contracts under the marketing moniker "D.E.B.T. Box"—standing for Decentralized Eco-Friendly Blockchain Technology—with the tagline "Where Crypto Meets Commodities." The investment contracts, in the form of license agreements, gave investors the right to DEBT Box crypto assets that were purportedly associated with specific real-world projects involving oil, natural gas, and beverage distribution, among others.

8. DEBT Box told prospective investors that the proceeds from the license agreement sales would be used to "support" or invest in real-world projects selected, vetted, and approved by the "DEBT Council," which was a group marketed by DEBT Box that consisted of

Anderson, Brannon, Nelson, and Anderson's brother. DEBT Box and the DEBT Council represented that they were considering multiple partners to add to existing business lines, stating that they were constantly and continually considering "multiple projects [that were] in the pipeline and [that] new projects [were] being reviewed regularly."

9. For example, investor proceeds from the sale of a "BGLD" (*i.e.*, Black Gold) license agreement were supposed to be invested in oil projects vetted, selected, and approved by the DEBT Council, and investor proceeds from the sale of an "ALUM" (*i.e.*, aluminum) license agreement were supposed to be invested in aluminum projects vetted, selected, and approved by the DEBT Council. The term "Project-Specific" is used in this complaint to refer to the DEBT Box investments associated with specific lines of business, such as BGLD or ALUM.

10. DEBT Box told investors that the real-world projects generated revenue in the form of royalties. DEBT Box further told investors that they should expect to profit from that revenue because DEBT Box would use that revenue to buy crypto assets distributed to investors by DEBT Box and "burn" them, thereby removing them from the market. DEBT Box told investors that buying and burning crypto assets would increase the value of the remaining crypto assets held by investors. The Anderson Defendants made these statements in written materials and oral statements during presentations and interviews posted on the internet.

11. That revenue from real-world projects supposedly differentiated DEBT Box's crypto assets from meme coins, and DEBT Box marketed its investments with statements such as: "*No Fake Meme Coins Here*. Real projects tied to real assets." (Emphasis in original.)

12. DEBT Box used examples to bolster this claim by telling investors that certain projects, including BGLD, had received substantial amounts of revenue in the form of royalty

payments that were used to buy BGLD tokens and remove them from circulation in the crypto ecosystem by burning them.

13. But DEBT Box never received any revenue from real-world projects.

14. To hide the absence of revenue that was supposed to be used to buy and burn DEBT Box tokens, Anderson and Blox used about $101 million of the $161 million in investor funds that DEBT Box received to buy Project-Specific tokens.

15. Indeed, less than $15 million of the $200 million generated from license agreement sales was "deployed" to real-world project businesses, most of which were not obligated to pay royalties to DEBT Box.

16. The investor funds used to buy and burn tokens served as the primary source of redemptions for investors. Using investor funds to redeem investors—what Anderson called "token support"—was necessary to sustain DEBT Box in the absence of the promised royalties. As the fraud was proving unsustainable, Anderson told the rest of the DEBT Council, "100% of full license sales need to go to token support **or this shit will claps [sic] on its self**. The budget was planned for royalties a year ago." (Emphasis added.)

17. Although DEBT Box received no revenue from real-world projects, millions in investor funds went to Defendants and the Relief Defendant. In addition to the $101 million used as disguised revenue, approximately $37 million went to Anderson, Blox, or Business Funding, $14 million ultimately went to DLI, Brannon, or Nelson, and approximately $9 million was returned to a third-party promoter or used for other purposes.

18. By engaging in the conduct alleged in this Complaint, Anderson and Blox violated Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a), and

Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

19. Brannon, Nelson, and DLI gave investor funds to companies in which they owned an interest that had no obligation to repay these funds, pay royalties to DEBT Box, or provide any other goods or services to DEBT Box. Brannon and DLI were intricately involved in preparing, and failed to correct, some of the false and misleading statements in DEBT Box marketing materials, all of which were deceptive acts in furtherance of the deceptive scheme. Brannon, Nelson, and DLI received investor funds by means of false and misleading statements. Nelson also sent false and misleading promotional materials to one investor and propped up the price of one Project-Specific token.

20. By engaging in the conduct alleged in this Complaint, Brannon, Nelson, and DLI violated Securities Act Sections 17(a)(2) and (a)(3), 15 U.S.C. §§ 77q(a)(2)-(3).

21. Unless Defendants are restrained and enjoined, they will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

22. Relief Defendant Business Funding received illicit proceeds from Defendants' fraud to which it has no legitimate claim and under circumstances in which it is not just, equitable, or conscionable for it to retain the funds.

## DEFENDANTS AND RELIEF DEFENDANT

23. **Jason Anderson**, age 47, resides in St. George, Utah. Anderson solely owns and controls Blox and Relief Defendant Business Funding.

24. **Schad Brannon,** age 53, has a home in Encino, California. He is a co-founder, president, and board member of DLI.

25. **Roydon Nelson**, age 54, resides in St. George, Utah. Nelson is a co-founder, treasurer, secretary, and board member of DLI.

26. **Blox Lending, LLC** ("Blox") is a Nevada limited liability company formed on August 14, 2020, and is headquartered in Draper, Utah. Anderson solely owns and controls and is the sole member and manager of Blox, which claims to be in the real estate and real estate lending business. There are no employees of Blox. Anderson was the sole signatory on five Blox bank accounts that received investor funds, and he, along with his brother, were the only signatories on one Blox bank account that received a few deposits of investor funds from a promoter.

27. **Digital Licensing, Inc.** ("DLI") is a Wyoming corporation with its principal place of business during the Relevant Period in Utah. DLI was formed on March 18, 2021. Brannon is a co-founder, 50% owner, president, and board member of DLI. Nelson is a co-founder, 50% owner, treasurer, secretary, and board member of DLI. Both were the only two signatories on DLI's bank accounts. There were no other employees of DLI.

28. **Relief Defendant Business Funding Solutions, LLC** ("Business Funding") is a Utah limited liability company formed on May 17, 2018, and is headquartered in Draper, Utah. Anderson solely owns and controls Business Funding. Business Funding received at least $15,197,761 in investor funds from DLI's bank accounts and from a third-party promoter.

## JURISDICTION AND VENUE

29. This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1), and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b), 77t(d)(1), and 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e), and 27(a) of the Exchange Act, 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e), and 78aa(a).

30. The Court has personal jurisdiction over Defendants and Relief Defendant, and venue is proper in the District of Utah pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a), because many of the acts and transactions constituting violations of the Securities Act and Exchange Act occurred in this district, including misuse of investor funds through transactions at banks located in this district and crypto asset wallets controlled in this district. In addition, Anderson and Nelson reside in this district, DLI and Blox have or had their principal places of business in this district, and one or more investors in DEBT Box reside in this district. Venue in this district is consistent with a court order requiring that this Complaint be filed in this district before Judge Robert Shelby. *See SEC v. Digital Licensing, Inc. et al.*, Case No. 23-cv-00482-RJS-DBP, Order Granting SEC's Motion to Dismiss Without Prejudice, ECF No. 313 at 11, 13-14 (D. Utah May 28, 2024).

## FACTS

### I. BACKGROUND

#### A. The Formation and Structure of DEBT Box

31. In the spring of 2021, Brannon, Nelson, and DLI, and Anderson and Blox, were separately developing their own crypto asset projects. By late June 2021, Brannon suggested that he, Nelson, and DLI "pool resources" with Anderson and Blox to build a crypto ecosystem.

32. By late June 2021, the Anderson Defendants had hired a software developer to create and manage software systems for a crypto ecosystem that came to be known as the "D.E.B.T. ecosystem." Under an agreement between Blox and the software development company, Blox owned and had authority over the programs and technology created by the developer, including the DEBT Box crypto ecosystem, mobile phone applications, websites, a dashboard, license agreements, and crypto asset wallets, among others.

33. In or around August 2021, DLI and Blox created a joint venture branded as DEBT Box to develop crypto assets. A document titled "Memorandum of Understanding," dated August 1, 2021, ("MOU") purports to memorialize the agreement between DLI and Blox.

34. The MOU described the roles and responsibilities of Blox and DLI regarding their DEBT Box joint venture enterprise. In pertinent part, it stated that Blox is the developer and owner of the intellectual property related to blockchain and software technology and that DLI wishes to license that intellectual property "to form an ecosystem that will be known as 'DEBT Box'."

35. Under the MOU, DLI had the right to sell license agreements. DEBT Box referred to these license agreements using various terms, including "software mining licenses," "software mining licenses (node)," and "node license agreements." This complaint refers to these agreements as "license agreements."

36. Under the MOU, DLI also had the right to offer multiple crypto assets using smart contracts. DLI offered these crypto assets subject to the license agreements.

37. Under a license agreement, the purchaser (sometimes referred to by DEBT Box as a "license holder" or "node software holder") was entitled to receive Project-Specific tokens.

38. Under the MOU, Blox agreed to provide "educational materials, assistance with onboarding new clients and customer support as may be needed for node software holders."

39. Consistent with the MOU, DEBT Box, a joint venture created by Blox and DLI, was the outward-facing brand that offered and marketed the license agreements, including marketing materials. Purchasers of license agreements were directed to the websites thedebtbox.com or app.thedebtbox.com.

40. DEBT Box is the entity that investors understood was making representations about what they should expect from their investment and which sold them license agreements that entitled them to crypto assets.

41. DEBT Box used terms interchangeably to refer to itself, such as D.E.B.T., DEBT Box, and DEBT Council.

42. Despite the interchangeable use of terms, DEBT Box marketing materials at times referred to the "DEBT Council" as a group of individuals: Anderson, Brannon, Nelson, and Anderson's brother. DEBT Box marketing materials explained that the DEBT Council was responsible for certain work, including the vetting and approval of partners in real-world projects.

43. By agreement among Defendants, Brannon, Nelson, and DLI were responsible for most of the "physical side" of DEBT Box—that is, managing the real-world commodity project partners with witch DEBT Box claimed to be working. Brannon and Nelson had the power to act and did act on behalf of DLI. DLI had no other employees during the Relevant Period.

44. By agreement among Defendants and under the MOU, Anderson and Blox were responsible for the "digital" side of DEBT Box, the websites, mobile application, dashboard,

license agreements, and crypto asset wallets that made up the DEBT Box crypto assets ecosystem. Anderson solely owned and controlled, and was the sole member and manager, of Blox. There were no other employees of Blox during the Relevant Period. Anderson had the power to act and did act on behalf of Blox.

45. The DEBT Box ecosystem—account login, dashboard, creation of Project-Specific tokens, token distribution to investors, and crypto asset wallets—began operation for investors in or around November 2021.

**B. DEBT Box Received Over $161 Million from Investors through the Sale of Over $200 Million Worth of Securities in the Form of License Agreements.**

46. While DEBT Box was the entity and brand that marketed and offered license agreements, investors purchased the license agreements from DLI.

47. Through early August 2023, DEBT Box offered and DLI sold over $200 million worth of license agreements to over 100,000 investors throughout the United States and the world. DEBT Box received at least $161 million of those funds and the remainder was paid to promoters as commissions.

48. With the help of Anderson, DLI sold DLG (Digitally Linked Gold – Gold), license agreements in the spring of 2021, before any digital ecosystem had been created. Investors who bought these license agreements began to receive DLG token distributions in October and November 2021, when the DEBT Box digital ecosystem began operation.

49. Below is a chart listing the Project-Specific license agreements, the real-world projects that were purported to be associated with them, and when the license agreements were first offered to investors. The associated Project-Specific tokens typically began being distributed shortly after license agreements were made available to investors:

| Ticker Symbol / Token (Real-World Project) | First Offered for Sale to Public |
|---|---|
| BGLD (Black Gold – Oil) | November 2021 |
| DLG (Digitally Linked Gold – Gold) | November 2021 |
| GROW (Agriculture – Cannabis) | April 2022 |
| NATG (Natural Gas) | April 2022 |
| XPLR (Explore - Remote Sensing and Satellite Technology Used for Commodity Exploration) | July 2022 |
| ALUM (Aluminum) | July 2022 |
| BEV (Beverage manufacturing and distribution) | January 2023 |
| BLOX (Real Estate) | January 2023 |
| DRIP (Water) | April 2023 |
| DCM (Data Center Mining) | May 2023 |
| REV (Exotic Cars, RVs, Boats, Aircraft) | July 2023 |

50. In addition, starting on February 1, 2022, DEBT Box offered a "Utility Token" called the DEBT token that was subject to a license agreement and used the ticker symbol "DEBT." Unlike a Project-Specific token, the DEBT token was not linked to a purported real-world project.

51. A primary function of the DEBT token was to provide a path for investors to exchange Project-Specific tokens for mainstream crypto assets. By design, investors were not able to exchange Project-Specific tokens for crypto assets unrelated to the DEBT ecosystem, such as stablecoins. They first had to exchange those Project-Specific tokens for DEBT tokens. They could then exchange the DEBT tokens for mainstream crypto assets.

52. During the Relevant Period, DEBT Box solicited investors by distributing and directing investors to offering materials ("Offering Materials") including the following:

a. websites, including websites with the addresses blackgoldrewards.com and thedebtbox.com ("Websites");

b. informational "lite papers" for each Project-Specific license agreement and token that DEBT Box published online on the Websites ("Lite Papers");

c. email newsletters and updates sent to investors ("Email Updates");

d. news updates on the Websites and mobile app, social media, videos, Zoom meetings; and

e. social media and marketing channels managed by third-party promoting companies and individuals.

53. As detailed more below, Lite Papers for each specific project were substantially similar and included representations about how DEBT Box license agreements worked, how investors would receive crypto asset distributions, the work that would be done to generate investors' profit, and information about the associated real-world commodity or royalty projects.

54. As alleged in detail below, DEBT Box represented to investors in the Lite Papers, Websites, Email Updates, and oral representations that it used royalties from real-world projects to buy and burn Project-Specific tokens to increase their value.

55. The Lite Papers described "areas" that would impact the supply of Project-Specific tokens, such as the placement of tokens into a pool where they would be distributed upon activation of license agreements, transaction fees, a periodic reduction of tokens that were placed into the pool of tokens available to be distributed to investors, and royalties from real-world projects used to buy and burn tokens. Royalties from real-world projects were the only

asset external to the DEBT Box digital ecosystem identified in the Lite Papers that would be used to create profits for investors.

56. During the Relevant Period, investors would buy a Project-Specific license agreement by either wiring money to DLI's bank accounts, sending crypto assets to DEBT Box's designated crypto asset payments wallets, or buying license agreements through third-party promoters who then either wired money to DLI's, Blox's, or Business Funding's bank accounts or sent crypto assets to crypto asset payments wallets controlled by Anderson and Blox.

57. DLI's bank accounts received just under $26 million of investor funds. Brannon and Nelson were the sole signatories on all of DLI's bank accounts that received investor funds and controlled those funds. DLI paid approximately $12 million to Anderson's company, Business Funding, leaving approximately $14 million in the DLI Defendants' control.

58. Anderson and Blox controlled or had authority over all the crypto asset payments wallets that received investor funds.

59. Anderson and Blox received and controlled approximately $147 million in investor funds as follows:

a. Approximately $15.2 million to Business Funding's bank accounts (which includes payments from DLI and payments from a third-party promoter);

b. Approximately $3.3 million to Blox's bank accounts from a third-party promoter; and

c. Approximately $129 million in U.S. Dollars ("USD") equivalent in payments of external crypto assets (valued as of the date of transfer) to crypto asset payments wallets that Anderson and Blox controlled.

60. Anderson and Blox controlled or had authority to direct where these funds were transferred and how they were used.

## C. How DEBT Box's Project-Specific License Agreements and Tokens Worked

### 1. Background on Crypto Assets and Crypto Asset Networks

61. DEBT Box's offering materials referred to crypto assets and crypto asset networks. This Complaint uses the following terms and background information when discussing these components.

62. The term "crypto asset" means any digital representation of value that is recorded on a cryptographically secured distributed ledger.

63. The term "crypto asset wallet" or "wallet" means an application that stores private keys that are needed to access and manage crypto assets. Crypto asset wallets are used to send and receive crypto assets. The term "crypto asset payments wallet" means a wallet used to receive payments in the form of crypto assets made to purchase license agreements.

64. A blockchain is a type of cryptographically secured distributed ledger where each set of digitally recorded information, such as transactions, is recorded in data packages called "blocks." The system relies on cryptographic techniques for securely recording transactions.

65. A "smart contract" is a software program that exists on a blockchain and executes automatically when certain conditions are met.

66. One such smart-contract crypto network or blockchain is the Binance Smart Chain (BSC), rebranded BNB Chain in February 2022.

67. "BEP-20" is a protocol (a set of rules or standards for how information is handled) for the creation of new crypto assets on the BNB Chain. The BEP-20 protocol allows

for the creation of customizable tokens that operate on the BNB Chain. Since BEP-20 tokens rely on an existing blockchain and its underlying technical architecture, new tokens can be created quickly by users with minimal technical expertise. To create a BEP-20 token, a person writes and deploys a smart contract that is recorded on the BNB Chain.

68. Once a BEP-20 smart contract is deployed on the BNB Chain, the token supply is generated upon the necessary conditions and is deposited into the address(es) designated in the smart contract. The owner of those addresses can then transfer the tokens to other addresses, which are recorded as transactions on the BNB Chain.

69. Project-Specific tokens were BEP-20 tokens created on the BNB Chain.

70. DEBT and some Project-Specific tokens were created, or "minted," at the time the project's software smart contract was deployed with a set initial supply, typically before license agreements were available to the public to buy (DEBT, DCM, DRIP, GROW, REV). Other Project-Specific tokens were created over time as license agreements were activated (ALUM, BEV, BGLD, BLOX, DLG, NATG, XPLR). In either case, the Project-Specific tokens were created by the smart contract that Blox's software developer wrote. They were not "mined" into existence through any consensus mechanism, like Bitcoin.

71. Although the Websites and Lite Papers reference "software mining licenses (node)," "mining," and "synthetic proof of work," none of the DEBT Box investors "mined" reward tokens, engaged in any consensus mechanism, such as a proof of work, or did anything else to "earn" rewards.

72. The DEBT Box license agreement holders did not operate an actual blockchain node, did not perform the work of validation, and did not solve complex mathematical equations to earn rewards or perform any service to the ecosystem or other function to earn rewards.

73. Thus, license agreement holders acquired tokens (in a process detailed below) without providing any services to DEBT Box, the ecosystem, or the real-world project partners.

**2. Investors Bought Project-Specific License Agreements and Received Project-Specific Tokens.**

74. In the first instance, Project-Specific tokens existed in a crypto asset wallet controlled by a smart contract. Investors obtained Project-Specific tokens through a series of steps.

75. The first step was the purchase of a Project-Specific license agreement.

76. The license agreements gave investors the right to receive the Project-Specific tokens designated by their ticker symbols of the associated real-world project.

77. During the Relevant Period, DEBT Box offered, and DLI sold, Project-Specific license agreements at prices ranging from a few hundred dollars to thousands of dollars per license agreement. Investors could not sell or transfer license agreements during the Relevant Period.

78. After buying a license agreement, investors would receive an emailed link or access their dashboard on the Websites or mobile app and "activate" their license agreement.

79. Upon activation of a license agreement, the smart contract transferred Project-Specific tokens from the smart contract crypto asset wallet to the Project-Specific Ecosystem Growth Initiative ("EGI") pool crypto asset wallet—which is a crypto asset wallet that DEBT Box controlled and was disclosed to investors as controlled by DEBT Box.

80. Next, every 24 hours, Project-Specific tokens in the EGI pool were allocated to each investor and transferred from the EGI pool wallet to a wallet called a "Piggy Bank" wallet. Each project had its own Piggy Bank Wallet. The amount of Project-Specific tokens allocated to an investor was calculated by an algorithm. The distribution formula was not publicly available on the blockchain. Anderson and Blox controlled, and had authority over, the precise distribution formula.

81. Investors could withdraw their Project-Specific tokens from the Project-Specific Piggy Bank wallet and transfer them to their private crypto asset wallets. For example, the NATG Lite Paper stated: "When your software mining license is active and connected to the internet, you will be rewarded with NATG tokens for supporting the DEBT Box blockchain ecosystem. Rewards generated today are deposited to the NATG Piggy Bank wallet within 24-hours. Withdraw these rewards to your DEBT Box wallet using the dashboard."

82. Investors could exchange their Project-Specific tokens for other Project-Specific tokens or for DEBT tokens, which could then be exchanged for other mainstream crypto assets. Investors could also use Project-Specific tokens to make DEBT Box ecosystem purchases, such as purchases of additional license agreements.

83. Investors could review a report on their dashboard in their account that showed their daily token distribution from the Project-Specific EGI pool wallet to the Project-Specific Piggy Bank wallet and, eventually, the USD value of what was distributed to the Project-Specific Piggy Bank, how many total crypto assets they had received and the USD value, and the overall USD value of their DEBT Box portfolio.

84. These DEBT Box tokens were the vehicle through which the value of royalties generated in real-world projects, *i.e.*, profit, would supposedly flow back to investors.

**D. How Project-Specific Tokens Were Valued**

**1. Background on Crypto Asset Trading Platforms**

85. Investors could exchange Project-Specific tokens on a crypto asset trading platform called Pancake Swap.

86. Pancake Swap used liquidity pools to make crypto assets available to buy and sell. Each liquidity pool typically contains two crypto assets and allows one asset in the pool to be swapped for the other asset in the pool.

87. A "liquidity pool provider" makes exchanges possible by depositing the two crypto assets comprising the pairs into the pool. Anyone can participate as a liquidity pool provider. The smart contract software governing each pool, using a mathematical formula called an automated market maker, maintains a constant ratio of that pair of crypto assets in the pool. As crypto assets are swapped into and out of the pool, the automated market maker automatically adjusts the price of the crypto assets to maintain the constant ratio.

88. As a result, when one token of the pair is purchased out of the pool, the price of that token becomes more expensive.

**2. Anderson and Blox Created DEBT Box Liquidity Pools.**

89. To exchange Project-Specific tokens for widely available crypto assets external to the DEBT Box ecosystem, which could be converted to USD, investors first had to sell Project-Specific tokens for the DEBT token and, second, sell the DEBT token for the external crypto assets.

90. To facilitate the first step, Anderson and Blox created DEBT token to Project-Specific token liquidity pools to provide a place for investors to sell Project-Specific tokens for DEBT tokens. Each of these liquidity pools paired a Project-Specific token with the DEBT token.

91. To facilitate the second step, Anderson and Blox created three liquidity pools that allowed users to sell DEBT (or early in the Relevant Period, BGLD) for widely traded crypto assets external to the DEBT Box ecosystem that had USD values:

a. Anderson and Blox created a liquidity pool that paired BGLD and WBNB on December 8, 2021 ("BGLD-WBNB Pool"). WBNB is a token that represents Binance Coin (BNB) on the Ethereum blockchain, a non-stable coin whose price fluctuates but is widely traded and can be easily converted to U.S. dollars.

b. Anderson and Blox created a liquidity pool that paired the DEBT token and WBNB on March 28, 2022 ("DEBT-WBNB Pool"). Anderson and Blox removed the majority of liquidity by June 2022, in large part to fund the DEBT-[BSC-USDC] liquidity pool described below.

c. Anderson and Blox created a liquidity pool that paired the DEBT token with BSC-USDC ("DEBT-[BSC-USDC] Pool") on June 29, 2022. BSC-USDC refers to USD Coin (USDC), a stablecoin operating on the BNB Smart Chain (BSC). This liquidity pool was the largest and most widely used DEBT Box liquidity pool.

92. Below is a chart showing liquidity pools and the dates that Anderson and Blox created them. The liquidity pools that paired external crypto assets are in bold:

| Token Pair | Creation Date |
|---|---|
| **BGLD-WBNB** | **12/8/2021** |
| BGLD-DEBT | 3/23/2022 |
| **DEBT-WBNB** | **3/28/2022** |
| GROW-DEBT | 5/27/2022 |
| NATG-DEBT | 5/27/2022 |
| **DEBT-[BSC-USDC]** | **6/29/2022** |
| LDLG-DEBT | 7/13/2022 |
| ALUM-DEBT | 7/29/2022 |
| XPLR-DEBT | 7/29/2022 |
| BGLD-DEBT (a new BGLD pool) | 11/29/2022 |
| BEV-DEBT | 4/3/2023 |
| BLOX-DEBT | 4/3/2023 |
| DRIP-DEBT | 4/17/2023 |
| DLG-DEBT (a revised DLG pool) | 5/16/2023 |
| DCM-DEBT | 5/25/2023 |
| REV-DEBT | 10/16/2023 |

### 3. The Value of DEBT and Each Project-Specific Token were Determined in Liquidity Pools.

93. Anderson and Blox were the liquidity pool providers for all the DEBT Box liquidity pools identified above. They provided over 99% of the liquidity in the external crypto assets pools: BGLD-WBNB, DEBT-WBNB, and DEBT-[BSC-USDC].

94. In the DEBT Box liquidity pools paired with external assets (the BGLD-WBNB Pool, DEBT-WBNB Pool, and DEBT-[BSC-USDC] Pool), the prices of BGLD and DEBT were derived from two values: (1) the price of WBNB and BSC-USDC, which have USD values, and

(2) the ratio of these crypto assets to BGLD and DEBT determined by the automated market makers for those pools. The price of a crypto asset in a pool would decrease as more of that crypto asset was sold into the pool, and the price would increase as more of that crypto asset was bought out of the pool.

95. For example, when creating the BGLD-WBNB Pool on December 8, 2021, Anderson and Blox deposited 141.19 WBNB and 201,724,820 BGLD, which set the initial price of BGLD at $0.0004. Between December 8, 2021, and January 10, 2022, all users who transacted in this pool sold more WBNB into the pool than BGLD, and the price of BGLD increased from $0.0004 to $0.0010.

96. Once the DEBT to external crypto assets liquidity pools were created, DEBT effectively had an easily identifiable and current, *i.e.*, market, USD value. For example, on July 1, 2022, soon after Anderson and Blox created the DEBT-[BSC-USDC] Pool, DEBT had a price of $20.0460. And as users sold more external crypto assets into the pool, the price of DEBT would increase or be higher than it otherwise would have been (as countervailing sales of DEBT into the pool would push down the price of DEBT).

97. Once DEBT had a USD market value as a result of the external asset liquidity pools, the Project-Specific tokens also obtained a USD market value as a result of the DEBT to Project-Specific liquidity pools.

98. The alleged value of crypto assets in this Complaint is based on the price of the crypto asset on the day of an alleged transaction.

99. Under this framework, the price of Project-Specific tokens was derived from two values: (1) the price of DEBT, which, as explained above, now had a USD value, and (2) the ratios of DEBT to the Project-Specific tokens in their respective liquidity pools.

100. Investors could see the value of their crypto assets on the DEBT Box dashboard displayed on the DEBT Box Websites and mobile apps. As investors acquired Project-Specific tokens from the Project-Specific Piggy Bank wallets, their DEBT Box dashboards would display the amount of Project-Specific tokens they received, the value of those tokens and, eventually, the overall value of their entire portfolio of Project-Specific tokens.

101. In sum, the market value of investors' portfolios of DEBT Box crypto assets, which was displayed on a continuous basis to investors in their dashboards, was the product of the number of crypto assets in the portfolio and the prices of those assets in the liquidity pools.

## II. DEBT BOX'S PROJECT-SPECIFIC LICENSE AGREEMENTS ARE SECURITIES AND WERE OFFERED AND SOLD USING INSTRUMENTALITIES OF INTERSTATE COMMERCE.

102. Project-Specific license agreements are investment contracts and therefore securities pursuant to Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act that define "security" to include, among other things, any "investment contract."

103. An investment contract involves: (1) the investment of money; (2) in a common enterprise; (3) with a reasonable expectation of profits to be derived from the efforts of others. *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946).

104. As detailed in this section, both DLI and Blox offered the investment contracts through their joint venture, DEBT Box. Under the MOU and the terms of the investment contracts, DLI is the entity that sold the investment contracts.

### A. Investors Bought DEBT Box License Agreements as Investments Expecting to Profit.

105. Throughout the Relevant Period, investors acquired Project-Specific license agreements by paying cash or crypto assets.

106. Project-Specific license agreements were investments in a common enterprise where the economic reality of the transactions involved an investment for profit.

107. During the Relevant Period, DEBT Box marketed the Project-Specific license agreements as profitable investments such that a reasonable investor would expect to profit. DEBT Box represented to investors that they could profit by receiving Project-Specific tokens and the price of those tokens would increase because DEBT Box would generate royalty payments from real-world projects that would be used to buy and burn those tokens, increasing their price.

108. For example, the ALUM Lite Paper stated:

> In exchange for this technically advanced service, Digital Licensing, Inc. negotiates a portion of the increased production in the form of a royalty stream from each commodity-based project. By generating increased production, which did not previously exist for the given raw material, and by exchanging that newly created value, DLI is able to support the limiting of ALUM token supply over time. This is done by utilizing the ALUM smart contract to direct the royalty stream payments through the ALUM trust fund to perpetually purchase ALUM rewards from the secondary market and burn these tokens never to be seen again. True to deflationary tokenomics, by removing or burning these tokens, *the value of the remaining token holders' wallets increases*. (Emphasis added.)

109. At a January 14, 2023, investor conference in Salt Lake City called the X-Node Conference, which was attended by hundreds of potential and actual investors, Anderson's

brother, a member of the DEBT Council, told a room full of investors and promoters the following:

> DEBT is the exception, but behind every project there is a real-world asset generating company, project behind the scenes that has signed onto royalties with DEBT Box. Those royalties are collected and put into a trust. That trust has one function, and one function only, and that is to buy that token out of a third-party ecosystem, store it, and burn it so that it never gets seen again. . . . *Burning token decreases, you know, supply, then inherently the burning of token over time will increase the value*. So if I have a royalty coming in every month, would I rather that royalty burn 100 token, or would I rather that royalty burn 1,000 token? 1,000. (Emphasis added.)

110. At that same X-Node Conference, Anderson touted the purported profitability of DEBT Box, claiming that "*We've created* roughly 10,000 new millionaires in the United States." (Emphasis added.)

111. On a YouTube video posted on August 3, 2022, entitled "Leaked Audio with DEBT Box Founders Jason … Anderson," ("DEBT Box Founders Video") Anderson and his brother had the following exchange with a promoter who spoke with them:

> <u>Promoter</u>: So one of your biggest unique selling propositions is the fact that you take the profits from the royalties, and you buy the tokens and remove them which creates a deflationary effect that drives the overall value up in time, am I understanding that correctly?
>
> <u>Anderson's brother</u>: You always have a guaranteed buyer for the coin.
>
> <u>Anderson</u>: You always have a guaranteed buyer.

112. Both the blackgoldrewards.com website, a website owned and controlled by Anderson, and the associated BGLD Lite Paper posted on that website stated that "PROJECT

REVENUE" will be used "to buy BGLD out of the market and send 100% of those tokens to the burn wallet never to be seen again."

113. In a February 7, 2022, Email Update, DEBT Box touted BGLD's price increase: "Black Gold Token (BGLD) launched in October 2021 and is already showing great success with 61,000% growth in value since launch. As of the date if [sic] this newsletter, the trading volume for the last 7 days is over $2,000,000.00 with liquidity at $9,730,000.00. The current market cap is over $5.5 billion as reported by Pancake Swap on February 7, 2022."

114. In an April 25, 2022, Email Update, with the subject line "BURN NOTICE: BGLD Update," Anderson and Blox stated:

> DRILLING UPDATE: Part of the BGLD Tokenomics includes a percentage of revenue generated from the equity in oil well projects being converted to BGLD tokens and sent to the burn wallet, never to be seen again. Today, BGLD completed its first burn from acquired tokens, with 3.348 billion BGLD tokens sent to the burn wallet. . . . 3,348,000,000 tokens X $0.0103856 per token = $34,770,998.08.

115. Below this statement was a screenshot (shown below) showing the price of BGLD dramatically increasing the same day as the burn:



116. Throughout the Relevant Period, the information and layout of the online dashboard emphasized the profitability of investors participating in the DEBT Box enterprise. The dashboard allowed purchasers to view the status of their license agreements, rewards, and portfolio.

117. For example, the dashboard displayed on the Websites and mobile apps had a tab for "Rewards" where purchasers could view their Project-Specific token balance, the overall USD value of all Project-Specific tokens, how many tokens they had received in the current cycle and the USD value, and how many tokens their license agreement had received in the last cycle and the USD value.

118. A presentation slide, entitled, "Intuitive Interface," that DEBT Box presented to a promoting company and its representatives, some of whom became investors, in early April 2022, showed a screenshot of the rewards tab:



119. By June 2022, DEBT Box updated the login page to make the dashboard the default landing page when someone logged into their account on the Websites or mobile apps showing their current rewards, crypto asset wallets, goals, token values, and overall portfolio value. DEBT Box also added to the login page a "Portfolio Page" tab that would be "a comprehensive break down of the total value of your rewards, DEBT Box wallet, and license values across all DEBT Box Projects."

120. A typical investor's portfolio page contained the below information with respective values:




121. The DEBT Box mobile app also displayed the amount and value of each Project-Specific token an investor owned. In addition, it provided the amount and value being distributed in the current cycle and in the last cycle.

**B. Investors Expected to Profit from the Ongoing Managerial Efforts of DEBT Box, including Anderson, Brannon, Nelson, Blox, and DLI.**

122. Throughout the Relevant Period, DEBT Box represented to investors that it used royalties from real-world projects to buy and burn Project-Specific tokens to increase their value.

123. DEBT Box represented to investors that it would continue to find, vet, and negotiate with "partners" that would generate royalty streams for each DEBT Box Project on an ongoing basis.

124. Thus, according to DEBT Box's representations to investors, to obtain revenue in the form of royalties, DEBT Box would use ongoing managerial efforts of its principals to secure royalties from current and future real-world project partners, and DEBT Box would continue to do so after Project-Specific license agreements and tokens were launched.

125. In addition, throughout the Relevant Period, DEBT Box represented that it would provide financial investments into real-world project partners. DEBT Box represented to investors that proceeds from the license agreement sales would be deployed into oil projects (BGLD), natural gas projects (NATG), and others that would then return royalties to DEBT Box, which it would use to buy and burn Project-Specific tokens to increase their value. In doing so, DEBT Box represented that it would make the managerial decisions of where, when, and how to deploy capital for the benefit of investors. The success of these decisions turned on the skill and expertise of DEBT Box in making them.

126. During the Relevant Period, DEBT Box also represented to investors in Lite Papers that it would provide ongoing technological and professional expertise, including DEBT Box's "proprietary remote sensing and satellite imagery technology" to real-world project

partners to help find commodities and increase their production (particularly for BGLD, ALUM, NATG, and XPLR license agreements).

127. In addition, most of the companies that owned or controlled the real-world commodity projects that were partnered with DEBT Box were owned (partially or wholly) by members of the DEBT Council. To the extent these "partners" received investor funds, members of the DEBT Council would make managerial decisions impacting whether these real-world commodity companies were successful.

128. Moreover, throughout the Relevant Period, DEBT Box also represented to investors that it would use revenue generated from royalty payments to buy and burn tokens to increase their value. In doing so, DEBT Box represented that it would make the managerial decisions about the use of revenue, including the timing and amounts of revenue used to buy-and-burn Project-Specific tokens. The success of these decisions relied on the skill and expertise of DEBT Box in making them.

### 1. "*We are a royalty acquisition company.*" - Representations About Managerial Efforts to Create Profits

129. Throughout the Relevant Period, DEBT Box represented that through its managerial efforts of finding, selecting, vetting, negotiating, and monitoring real-world project partners to send royalties to DEBT Box investors would profit, *i.e.*, that investors would profit through the ongoing efforts and expertise of DEBT Box and the DEBT Council.

130. In a January 30, 2023, podcast with a promoter that was posted on YouTube, Nelson and the promoter had the following exchange:

> Promoter: I can make money off of Roy Nelson's efforts, that's the best thing in the world.

> Nelson: Absolutely, it absolutely is.
>
> Promoter: You're out there working for me, I own my BGLD licenses and you're out there making all the deals, making it happen.
>
> Nelson: It's pretty awesome. . . .
>
> Promoter: . . . . I'm literally sitting in my home collecting a digital reward for the work that you guys are doing.
>
> Nelson: For other people's efforts. It's amazing.

131. The ALUM Lite Paper, published on DEBT Box's Website, contained statements explaining how investors would profit:

> The D.E.B.T. Box ecosystem benefits from physical production of these commodities by supporting real-world projects that generate ongoing revenues through the production and sale of these commodities. *These real-world commodity production projects benefit from the D.E.B.T. Box ecosystem through professional help from industry staff members that are employed by Digital Licensing, Inc.*, the ecosystem's permissioned administrator, project support through proprietary technologies, and operational assistance. Everyone wins!
>
> ….
>
> *Aluminum (ALUM) works closely* with developers, operators and land owners within the bauxite/aluminum industry and professionals and experts *to provide valuable exploration data* generated through a wide array of carefully curated technologies, including, but not limited to, proprietary remote sensing, satellite imaging technology, 3-D rendering, target drilling, geo-chemical analysis, assays, and other valuable earth science processes for a portion of, or the right to share in, additional commodity production from the project to the D.E.B.T. Box platform ecosystem. . . . *In exchange for this technically advanced service, Digital Licensing, Inc. negotiates a portion of the increased production in the form of a royalty stream from each commodity-based project.*
>
> ….
>
> *The DEBT Council* is responsible for managing the ecosystem and working with Digital Licensing, Inc., the platform's permissioned

> administrator, to add value for all software license and token holders. This is achieved by supplying liquidity to new markets, *increasing the production value of projects*, and providing liquidity for independent digital currency exchanges. (Emphasis added).

132. The BGLD Lite Paper, published on DEBT Box's Website, contained statements explaining how investors would profit:

> Digital Licensing, Inc. (DLI) has partnered with multiple oil exploration companies in North America and in Africa. The partners *selected by DLI, and the DEBT Council*, are generally independent oil exploration and production companies with successful track records and decades of "in the field" experience. The partners' experience, combined with *technical innovations brought by the DEBT Box ecosystem* create proprietary efficiencies in this industry which are exclusive to the DEBT Box platform. (Emphasis added.)

133. The BGLD Lite Paper explained DEBT Box's intended uses of investor proceeds and project revenue as follows:

> *Proceeds from the sale of software mining licenses are deployed into oil field exploration projects*. Oil field exploration projects result in producing oil wells pumping crude oil production…. Barrels of BGLD oil are sold to the refineries or to crude oil buyers. Proceeds from crude oil sales are paid into a trust fund…. The BGLD trust fund collects proceeds from crude oil sales to purchase BGLD coin and places them into a burn wallet. (Emphasis added.)

134. The NATG and XPLR Lite Papers, published on DEBT Box's Website, contained similar statements about DEBT Box's intended uses of investor proceeds and project revenue.

135. While members of the DEBT Council owned at least part of most partners that operated projects for supposed revenue for DEBT Box, Anderson told investors that, while he does not have the ability to manage all projects, he employs managerial efforts to select and hire partners to generate revenue.

136. At the January 14, 2023, X-Node Conference, Anderson's brother, a DEBT Council member, stated, "We have this beautiful function of the burn. That burn comes from royalties. Now you did hear me say royalty. Did I say 'ownership?' No, we said royalty. *We are a royalty acquisition company*. Our purpose out there is to continually add royalties to our ecosystem. Why royalties? . . . when money comes in, a royalty comes off the top." (Emphasis added.)

### 2. Representations about Ongoing Managerial Efforts to Create Profits After the Sale of Project-Specific License Agreements

137. DEBT Box not only represented that investors would profit through its managerial efforts to obtain royalty revenue and provide technical expertise, but that these managerial efforts would be ongoing and continual, even after Project-Specific license agreements had been sold.

138. The ALUM Lite Paper stated,

> As D.E.B.T. Box hardware and software are launching, the ecosystem is becoming more robust, the key focus now is growth. *Currently, there are multiple projects in the pipeline and new projects are being reviewed regularly. The diverse collection of real-world commodity production projects contribute to the roadmap for creating benefit* that can be used by D.E.B.T. Box software mining license holders, D.E.B.T. ecosystem token holders, as well as third-party token holders." (Emphasis added.)

139. The XPLR Lite Paper made similar representations.

140. The BGLD Lite Paper stated, "*Future oil field projects are being reviewed continuously.* There are currently 11 targeted sites in Nebraska, 3 in Louisiana, 2 in Arkansas, multiple oil field targets in Texas, and exploration work started on a very large onshore site in Ghana, West Africa near the prolific Gulf of Guinea ocean oil fields." (Emphasis added.)

141. The ALUM Lite Paper stated, "The DEBT council will work closely with DLI *to continue development* [sic] a variety of relationships in the aluminum industry that augment and increase mineral production for a share of the increased production and commodity sales revenues." (Emphasis added.)

142. The BLOX Lite Paper stated, "D.E.B.T. will *continue to use its unique position* to source additional royalty streams with the goal of increasing the size of token burns, further supporting the BLOX Project ecosystem." (Emphasis added.)

143. The BEV Lite Paper, published on DEBT Box's Website, contained a similar statement about DEBT Box's role in sourcing "additional royalty streams."

144. Brannon stated at the January 14, 2023 X-Node Conference, "Our technology has been in practical application for years. . . . you've heard us say that technology is at the basis of everything that we do. So we're constantly looking for new technologies to curate . . . . that's part of how we're able to keep coming up with these, you know, awesome projects."

145. In the DEBT Box Founders Video, Anderson explained that he remains involved with third-party partners who use DEBT Box's purported "scan technology":

> Anderson: We're seven months in and we have three oil companies we're currently partnering with, three exploratory . . .
>
> Promoter: Who is selling those partnerships?
>
> Anderson: Now that is something I'm heavily involved with. . . . because it's all based on the scan technology. . . . that is one thing we do regularly, ok now why, that is something that takes a lot of my time.

146. At the January 14, 2023, X-Node Conference, Anderson stated that he remained involved in the purported scanning technology that real-world products supposedly used on an ongoing basis.

147. At that same conference, Anderson explained that all investors profit together in the same enterprise from the DEBT Box's use of revenue to buy and burn tokens, stating that "[w]hat's nice is, I don't really care if you have a dingy or a yacht, the tide is going up."

148. At that same conference, an audience member asked how BEV was getting royalties. Anderson responded:

> We're going at the bottling facilities . . . the filling facilities. . . . currently right now, it's one. It's actually out of Mississippi. It is our test child in this. And since we've actually done that, we have six more coming on board. It's about growth. We have two companies right now. I'm not going to announce their names right now because I want [] to have something to announce next week. But you will recognize these products and these products are already in store shelves of Phillips, Target, Sam's Club, Walmart . . . 48-states wide.

149. At that same conference, Nelson stated the following about a video shown to the audience: "pictures I took from all of the projects that we're evaluating right now and doing diligence on right now to start bringing on line. The 17 [wells] that we just brought on line, is huge to the ecosystem, but it's just the beginning. We're currently evaluating, on the slide it says 100+, but as of yesterday, that increased to well over 200 wells that we're evaluating right now."

150. In a March 6, 2023, video interview with a promoter posted on YouTube, Nelson explained the work he had done for the ALUM, DLG, XPLR, NATG, and BGLD projects.

### C. DEBT Box Offered and DLI Sold Investment Contracts Using Instrumentalities of Interstate Commerce.

151. As detailed above, DEBT Box offered and DLI sold Project-Specific license agreements under which investors invested money in a common enterprise as an investment with a reasonable expectation of profit through the ongoing managerial efforts of DEBT Box.

152. In connection with the conduct alleged in this Complaint, Defendants, directly or indirectly, singly or in concert with others, made use of the means or instruments of transportation or communication in interstate commerce, the means or instrumentalities of interstate commerce, or of the mails, including soliciting investors located in Utah and other states by the internet and email, providing documents containing false and misleading statements to investors via email and the internet, and obtaining funds from those investors through interstate commerce. Investors in at least 15 states and numerous additional investors overseas purchased securities in the form of DEBT Box license agreements.

## III. ANDERSON AND BLOX MADE MATERIALLY FALSE AND MISLEADING STATEMENTS IN VIOLATION OF SECURITIES ACT SECTION 17(a)(2) AND EXCHANGE ACT SECTION 10(b) AND RULE 10b-5(b) (CLAIMS I & III).

153. In Lite Papers, Email Updates, Websites, and oral representations to investors and prospective investors, the Anderson Defendants made numerous materially false and misleading statements regarding, among other things, that royalties from real-world commodity and other royalty-generating projects were being used to buy and burn Project-Specific tokens, thereby increasing their value.

### A. The Anderson Defendants Made Statements on the Websites, in the Lite Papers, and in the Email Updates.

154. Throughout the Relevant Period, Anderson and Blox made the statements in the Lite Papers, on the Websites, and in the Email Updates.

155. The MOU stated, "BLOX is the developer and owner of intellectual property related to blockchain technology using the BEP-20 network." Per the MOU, this intellectual property included the user dashboard containing Email Updates and the Websites containing the Lite Papers.

156. The MOU also stated that "BLOX agrees to provide educational materials, assistance with onboarding new clients and customer support as may be needed for node software holders."

157. The Lite Papers, Websites, and Email Updates were all "educational materials" for purposes of the MOU.

158. Anderson registered the Websites blackgoldrewards.com and thedebtbox.com to his GoDaddy web registration account, and had control over the content of the Websites during the Relevant Period.

159. Anderson directed the preparation of, reviewed, and exercised final approval and authority over the Lite Papers, Websites, and Email Updates. In doing so, Anderson determined the content of, and had ultimate authority over, the statements made in the Lite Papers, on Websites, and in Email Updates. He also had ultimate authority over the means of dissemination of the statements.

160. Anderson was also the maker of, and had ultimate authority over, his own oral representations to investors because he made them.

161. Anderson made the statements below in his capacity as Blox's sole owner, controller, and employee in its joint venture with DLI known as DEBT Box. Given Anderson's role at Blox, his actions and his state of mind are imputed to Blox for the statements alleged in this Complaint.

### B. The Anderson Defendants Made Materially False and Misleading Statements that Royalties Were Used to Buy and Burn BGLD.

162. On Websites, in Lite Papers, and in Email Updates, Anderson and Blox made materially false and misleading statements that royalties were used to buy and burn BGLD, when in fact DEBT Box never used any royalties from oil or any other source to buy and burn BGLD. Instead, Anderson used investor funds disguised as royalty revenue to buy and burn BGLD.

163. From November 2021 through April 2022, the blackgoldrewards.com website and the BGLD Lite Paper published on that website stated that BGLD was "[s]upported by the sale of crude being produced by well number NVNO82639 in White Pine County, Nevada, Black Gold Node operators [*i.e.*, BGLD license purchasers] are rewarded for their blockchain support with BGLD tokens."

164. From November 2021 through April 2022, the blackgoldrewards.com website and BGLD Lite Paper also stated that DEBT Box would use "PROJECT REVENUE" "to buy BGLD out of the market and send 100% of those tokens to the burn wallet never to be seen again."

165. As explained above in paragraphs 114-115, an April 25, 2022, Email Update, with the subject line "BURN NOTICE: BGLD Update," stated the following: "DRILLING UPDATE: Part of the BGLD Tokenomics includes a percentage of revenue generated from the equity in oil well projects being converted to BGLD tokens and sent to the burn wallet, never to be seen again. **Today, BGLD completed its first burn from acquired tokens, with 3.348 billion**

**BGLD tokens sent to the burn wallet**. . . . 3,348,000,000 tokens x $0.0103856 per token = $34,770,998.08." (Emphasis in original.)

166. A BGLD Lite Paper available on thedebtbox.com and disseminated to investors from at least early May 2022 through the end of the Relevant Period further stated, "A percentage of revenue generated from vetted and approved oil well projects will be converted to BGLD tokens and sent to the burn wallet, never to be seen again. With revenues coming from multiple oil projects in various jurisdictions on multiple continents, BGLD tokens will continually be taken out of market."

167. The same BGLD Lite Paper included statements that oil royalties are used to buy and burn BGLD, as set forth in paragraph 133.

168. The same BGLD Lite Paper, disseminated to investors from at least early May 2022 through the end of the Relevant Period and posted on the "bgld-token" page on the thedebtbox.com website, available from at least March 2023 through the end of the Relevant Period, stated, "TOKENOMICS The DEBT Box Black Gold (BGLD) tokenomics have been designed as a deflationary token, to create a true supply and demand dynamic. The BGLD project is supported by four areas: • Oil production royalties …." Of the "four areas" that purportedly supported the BGLD project, oil production royalties were the only assets external to the DEBT Box ecosystem that could be used to create profits and affect the price of Project-Specific tokens through liquidity pools.

169. A reasonable investor would have understood from the statements that DEBT Box had received and was receiving revenue from oil projects. A reasonable investor would also

understand from these statements that DEBT Box had used and was using those funds to buy and burn BGLD tokens, which would increase the value of the BGLD token.

170. Each of the above representations in paragraphs 162-168 regarding the use of royalties to buy and burn BGLD were false and misleading when made because, during the Relevant Period, DEBT Box never received any royalties from oil production or sale and therefore never used revenue from oil projects to buy and burn BGLD.

171. The Anderson Defendants omitted to state material facts that were necessary to render their statements regarding using royalties to buy and burn BGLD not misleading. These omissions include that DEBT Box was not receiving and never did receive royalties from real-world oil projects, did not and never did use royalties from oil projects to buy and burn BGLD, and that Anderson instead used investor funds to buy and burn BGLD.

172. The Anderson Defendants knew or were reckless in not knowing, and should have known, that these statements and omissions about purported revenue from oil production were false and misleading:

a. As of at least November 13, 2021, the Anderson Defendants knew or were reckless in not knowing, and should have known, that the Nevada well supporting BGLD was shut down before producing or selling any oil. This is because Anderson and Brannon received an email on November 12, 2021, from the oil company responsible for the Nevada well referenced in the website and Lite Paper, indicating that the well had been shut down before it completed drilling and started producing or selling any oil. The email stated, "Before we could complete the drilling, the BLM issued a shutdown order yesterday." Anderson

and Brannon forwarded the email to Nelson by the next day. The Anderson Defendants were not aware of any other real-world oil projects in a partnership with DEBT Box that were generating income for DEBT Box at this time.

b. By the summer of 2022, DEBT Box had another purported real-world oil project partner working on a well in Nebraska. That well never produced or sold any oil and by at least August 23, 2022, Brannon emailed the oil project partner and Nelson that "drill bit has broken off in the hole and we're now not drilling" at the Nebraska site. Brannon also stated that Anderson was going to the drilling site that day or the next and that with the "impending trip of folks coming to see the project I pray we can still have a good enough showing with the drilling halted." Further, Nelson emailed Anderson on September 15, 2022, the notices of default that DLI sent to the oil project partner stating that the drill bit had broken. Anderson knew or was reckless in not knowing, and should have known, that the Nebraska well never produced revenue.

c. The Anderson Defendants owned, controlled, and had authority over the intellectual property of the DEBT Box digital ecosystem, including any crypto asset wallets that would have received royalties from real-world oil projects if that revenue were ever sent to DEBT Box. Anderson knew or was reckless in not knowing, and should have known, that no DEBT Box crypto asset wallets, during the Relevant Period, received or used any royalty revenue from real-world oil projects that could be used to buy and burn BGLD.

d. Anderson controlled the crypto asset wallets that ultimately received investor funds and Anderson used the crypto assets from these wallets to buy and burn BGLD. Anderson knew or was reckless in not knowing, and should have known, that investor funds, not royalty revenue, were used to buy and burn BGLD.

173. The above statements regarding using royalties from real-world oil projects to buy and burn BGLD were material to investors because a reasonable investor would consider it important that DEBT Box did not and had not received revenue from real-world oil projects and that BGLD was not supported by royalties but, instead, by the use of investor funds to make Ponzi-like payments.

**C. The Anderson Defendants Made Materially False and Misleading Statements that Royalties Were Used to Buy and Burn Other Project-Specific Tokens.**

174. The Anderson Defendants also made materially false and misleading statements that DEBT Box was receiving royalty revenue and that royalty revenue would be used to buy and burn the Project-Specific tokens as alleged in this section. In each case, the Anderson Defendants created the impression that DEBT Box had received royalty revenue and was using those funds to buy and burn Project-Specific tokens.

**1. Anderson Made Materially False and Misleading Oral Statements that Royalties Were Used to Buy and Burn Project-Specific Tokens.**

175. Anderson made false and misleading oral statements about the receipt and use of royalty revenue across all of DEBT Box's projects.

176. At the January 14, 2023, X-Node Conference, Anderson made the following statements, in addition to those set forth in paragraphs 146-148:

a. "*We have actual revenues coming in every single month*. Those are publicly done on blockchain…. understand everything is a ledger . . . . On the 19th and 20th of every single month, we announce our burns. We are fully transparent. *Every one of those burns actually happens over Pancake Swap. We use Pancake Swap instead of the hidden exchanges to make sure you guys understand this token is being acquired*." (Emphasis added).

b. "[*B*]*ut the royalties are going into Pancake Swap to do the burns*. So if you really want to know the liquidity, you basically take the monthly burn, calculate to USD, add the advertised USD value, and trust me, we are very liquid." (Emphasis added.)

177. In a Zoom meeting with investors that was posted on YouTube on July 14, 2022, Anderson stated:

> So, how we do this is we make sure there are revenues consistent coming into ecosystems and as revenues come in it burns the coin. . . . with the royalty model of the wells, what's happening is we are locking in a set fixed percentage of the extraction, and *we are putting it back into the ecosystem* burning it to never be seen again, it's the best liquidity provider in the world because *if you know that there's a consistent amount of revenue coming in from the underlying projects that's taking coins out, what happens?* Less and less coins exist. . . . *in oil for instance, just from the months of January through the last day of March,* ***$34.7 million was brought into the ecosystem****,* we've actually burned that and announced that in April." (Emphasis added.)

178. In a podcast Q&A recorded sometime after June 21, 2023, Anderson said, "We are pretty transparent right now with the *royalties*, we publish the trust . . . wallet . . . the blockchain shows it very clearly every single buy, every single burn, we actually give every

single month on 19th and 20th we burn and actually give out an announcement to the public of what actually happened in the last 30 days." (Emphasis added.)

**2. NATG - The Anderson Defendants Made Materially False and Misleading Statements that Royalties Were Used to Buy and Burn NATG.**

179. In a Lite Paper and on the website thedebtbox.com, Anderson and Blox made materially false and misleading statements that natural gas royalties were used to buy and burn NATG, when in fact DEBT Box never used any natural gas royalties to buy and burn NATG and instead Anderson used investor funds to do so.

180. The NATG Lite Paper, available on thedebtbox.com and disseminated to investors from at least early May 2022 through the end of the Relevant Period, stated:

> A percentage of revenue generated from vetted and approved natural gas projects will be converted to NATG tokens and sent to the burn wallet, never to be seen again. With revenues coming from multiple gas projects in various jurisdictions, on multiple continents, NATG tokens will continually be taken out of the market.
>
> Digital Licensing, Inc. (DLI) has partnered with multiple gas exploration companies in North America and in Africa. The partners selected by DLI, and the DEBT Council, are generally independent exploration and production companies with successful track records and decades of "in the field" experience.

181. The first two sentences from the prior NATG Lite Paper excerpt were also stated on the "natg-token" page on thedebtbox.com from at least October 2022 until the end of the Relevant Period.

182. The NATG Lite Paper stated:

> Proceeds from the sale of software mining licenses are deployed into natural gas exploration projects…. Natural gas exploration projects result in producing gas wells…. Natural gas is being produced from NATG sponsored projects…. Natural gas is sold to the refineries or

> buyers …. Proceeds from crude natural gas sales are paid into a trust fund…. The NATG trust fund collects proceeds from natural gas sales to purchase NATG coin and places them into a burn wallet. []

183. The NATG Lite Paper and the "natg-token" page on thedebtbox.com stated, "The DEBT Box Natural Gas (NATG) tokenomics have been designed as a deflationary token, to create a true supply and demand dynamic. The NATG project is supported by four areas: •Natural gas production royalties …." Of the "four areas" that purportedly supported the NATG project, natural gas production royalties were the only assets external to the DEBT Box ecosystem that could be used to create profits and affect the price of NATG tokens.

184. The NATG Lite Paper further stated:

> DEBT Box digital currency projects are linked to real-world commodities through blockchain to add stability to its ecosystem by supporting tangible physical commodity production, such as gold, silver, crude oil, natural gas, agriculture, real estate, and royalty cash flows, with more project to be announced.
>
> The DEBT Box ecosystem benefits from physical production of these commodities by supporting real-world projects *that generate revenues*. These real-world commodity production projects benefit from Digital Licensing Incorporated's financial support, technologies, and operational assistance. Everyone wins! (Emphasis added.)

**3. ALUM - The Anderson Defendants Made Materially False and Misleading Statements that Royalties Were Used to Buy and Burn ALUM.**

185. In a Lite Paper and on the website thedebtbox.com, Anderson and Blox made materially false and misleading statements that aluminum royalties were used to buy and burn ALUM, when in fact DEBT Box never used any aluminum royalties to buy and burn ALUM and instead Anderson used investor funds to do so.

186. The ALUM Lite Paper, available on thedebtbox.com and disseminated to investors from at least July 2022 through the end of the Relevant Period, stated:

> In exchange for this technically advanced service, Digital Licensing, Inc. negotiates a portion of the increased production in the form of a royalty stream from each commodity-based project. By generating increased production, which did not previously exist for the given raw material, and by exchanging that newly created value, DLI is able to support the limiting of ALUM token supply over time. This is done by utilizing the ALUM smart contract to direct the royalty stream payments through the ALUM Trust Fund to perpetually purchase ALUM rewards from the secondary market and burn these tokens never to be seen again. True to deflationary tokenomics, by removing or burning these tokens, the value of the remaining token holders' wallets increases.

187. The ALUM Lite Paper stated, "The D.E.B.T. Box Aluminum (ALUM) tokenomics have been designed as a deflationary token, to create a true supply and demand economic dynamic. The ALUM project is supported by four areas: • Aluminum project royalties…." Of the "four area" that purportedly supported the ALUM project, aluminum project royalties were the only assets external to the DEBT Box ecosystem that could be used to create profits and affect the price of ALUM tokens.

188. The ALUM Lite Paper stated:

> D.E.B.T. Box digital currency projects are supported by real-world commodities linked through the blockchain to add stability to its ecosystem with tangible physical commodity production, such as agriculture, bauxite, crude oil, gold, real estate, royalty cash flows, natural gas and silver just to name a few with more projects to be announced.
>
> The D.E.B.T. Box ecosystem benefits from physical production of these commodities by supporting real-world projects *that generate ongoing revenues* through the production and sale of these commodities. These real-world commodity production projects benefit from the D.E.B.T. Box ecosystem through professional help from industry staff members that are employed by Digital Licensing,

> Inc., the ecosystem's permissioned administrator, project support through proprietary technologies, and operational assistance. Everyone wins! (Emphasis added.)

### 4. XPLR - The Anderson Defendants Made Materially False and Misleading Statements that Royalties Were Used to Buy and Burn XPLR.

189. In a Lite Paper and on the website thedebtbox.com, Anderson and Blox made materially false and misleading statements that exploration-related royalties were used to buy and burn XPLR, when in fact DEBT Box never used any exploration project royalties to buy and burn XPLR and instead Anderson used investor funds to do so.

190. The XPLR Lite Paper, available on thedebtbox.com and disseminated to investors from at least July 2022 through the end of the Relevant Period, stated:

> For this technically advanced service approach, Digital Licensing, Inc. negotiates a portion of the increased production in the form of a royalty stream from each partner's commodity-based industry project. By generating increased production, which didn't previously exist for a given raw material, and exchanging that newly created value, DLI is able to support the limiting of XPLR token supply over time. This is done by utilizing the XPLR smart contract to direct the royalty stream payments through the XPLR Trust Fund to perpetually purchase XPLR rewards from the secondary market and burn these tokens never to be seen again. True to deflationary tokenomics, by removing the tokens, the value of token holders' wallets increase.

191. A nearly identical statement was made on the xplr-token page of thedebtbox.com website available from at least March 2023 through the end of the Relevant Period.

192. The XPLR Lite Paper stated:

> Proceeds from the sale of software mining licenses are deployed into exploration projects…. Exploration projects result in producing gas wells. . . . Royalties from commodities are being produced from XPLR sponsored projects []…. Royalties are received from commodity prodducti0on [sic] and sales. . . . Royalties from

> commodity production and sales are paid into a trust fund…. XPLR trust fund aggregates commodity royalties…. The XPLR trust fund collects proceeds from commodity production and sales…. The XPLR trust fund collects proceeds from commodity production and sales to purchase XPLR coin and places them into a burn wallet. []

193. The XPLR Lite Paper and the xplr-token page on thedebtbox.com stated, "The D.E.B.T. Box Explore (XPLR) tokenomics have been designed as a deflationary token, to create a true supply and demand economic dynamic. The XPLR project is supported by four areas: • Explore project royalties …." Of the areas that purportedly supported the XPLR project, "Explore project royalties" were the only assets external to the DEBT Box ecosystem that could be used to create profits and affect the price of XPLR tokens.

194. The XPLR Lite Paper stated:

> D.E.B.T. Box digital currency projects are supported by real-world commodities linked through the blockchain to add stability to its ecosystem with tangible physical commodity production, such as agriculture, bauxite, crude oil, gold, real estate, royalty cash flows, natural gas and silver, just to name a few, with more projects to be announced.
>
> The D.E.B.T. Box ecosystem benefits from physical production of these commodities by supporting real-world projects *that generate ongoing revenues*. These real-world commodity production projects benefit from the D.E.B.T. Box ecosystem through professional help from industry staff members that are employed by Digital Licensing, Inc., the ecosystem's permissioned administrator, project support through proprietary technologies, and operational assistance. Everyone wins! (Emphasis added).

**5. GROW - The Anderson Defendants Made Materially False and Misleading Statements that Royalties Were Used to Buy and Burn GROW.**

195. In a Lite Paper, Anderson and Blox made materially false and misleading statements that farming royalties were used to buy and burn GROW, when in fact DEBT Box

never used any agricultural royalties to buy and burn GROW and instead Anderson used investor funds to do so.

196. The GROW Lite Paper, available on thedebtbox.com and disseminated to investors from at least December 2022 through the end of the Relevant Period, stated: "A percentage of revenue generated from vetted and approved farming operations will be converted to GROW tokens and vaulted. With revenues coming from multiple Agricultural projects in various jurisdictions on multiple continents, GROW token will continue to be taken off the market."

197. The GROW Lite Paper stated:

> DEBT Box digital currency projects are linked to real-world commodities through blockchain to add stability to its ecosystem by supporting tangible physical commodity production, such as gold, silver, crude oil, natural gas, agriculture, real estate, and royalty cash flows, with more project to be announced.
>
> The DEBT Box ecosystem benefits from physical production of these commodities by supporting real-world projects *that generate revenues*. These real-world commodity production projects benefit from Digital Licensing Incorporated's financial support, technologies and operational assistance. Everyone wins! (Emphasis added).

**6. BEV - The Anderson Defendants Made Materially False and Misleading Statements that Royalties Were Used to Buy and Burn BEV.**

198. In a Lite Paper and on the website thedebtbox.com, Anderson and Blox made materially false and misleading statements that beverage industry royalties were used to buy and burn BEV, when in fact DEBT Box never used any beverage distribution royalties to buy and burn BEV and instead Anderson used investor funds to do so.

199. The BEV Lite Paper, available on thedebtbox.com and disseminated to investors from at least January 2023 through the end of the Relevant Period, stated, "D.E.B.T. digital currencies are supported by real-world commodities through royalties from projects which are used to purchase tokens out of the ecosystem through the blockchain to add stability with tangible revenues…. The D.E.B.T. ecosystem benefits from the token burns that occur from the purchase of tokens from project royalties received. These royalties are generated from real-world physical commodities, products and services."

200. The BEV Lite Paper stated, "Rather than create our own proprietary formula, BEV, the seventh D.E.B.T. project, is supported by royalties generated from the bottling and distribution of multiple beverages for multiple companies…. Royalties received will be used to buy BEV Project token out of the market to be burned."

201. The bev-token page of thedebtbox.com, available from at least March 2023 through the end of the Relevant Period, stated the identical first sentence of the Lite Paper excerpt quoted in the above paragraph.

202. The BEV Lite Paper and the bev-token page of thedebtbox.com stated that BEV was supported by five "areas," which includes "(BEV) project royalties" that "will purchase token out of the ecosystem and burn them." Of the areas that purportedly supported the BEV project, beverage industry project royalties were the only assets external to the DEBT Box ecosystem that could be used to create profits and affect the price of BEV tokens.

### 7. BLOX - The Anderson Defendants Made Materially False and Misleading Statements that Royalties Were Used to Buy and Burn BLOX.

203. In a Lite Paper, Anderson and Blox made materially false and misleading statements that real estate royalties were used to buy and burn BLOX, when in fact DEBT Box never used any real estate royalties to buy and burn BLOX and instead Anderson used investor funds to do so.

204. The Blox Lite Paper, available on thedebtbox.com and disseminated to investors from at least January 2023 through the end of the Relevant Period, stated, "D.E.B.T. digital currencies are supported by real-world commodities through royalties from projects which are used to purchase tokens out of the ecosystem through the blockchain to add stability with tangible revenues…. The D.E.B.T. ecosystem benefits from the token burns that occur from the purchase of tokens from project royalties received. These royalties are generated from real-world physical commodities, products and services."

205. The BLOX Lite Paper stated, "[T]he BLOX Project tokenomics are supported by five areas…. Blockchain Real Estate (BLOX) project royalties will purchase token out of the ecosystem and burn them." And the blox-token page of thedebtbox.com stated, "[T]he BLOX Project tokenomics are supported by five areas…. Blockchain Real Estate (BLOX) project royalties will purchase token out of the ecosystem and burn them." Of the areas that purportedly supported the BLOX project, real estate project royalties were the only assets external to the DEBT Box ecosystem that could be used to create profits and affect the price of BLOX tokens.

**8. DRIP - The Anderson Defendants Made Materially False and Misleading Statements that Royalties Were Used to Buy and Burn DRIP.**

206. In a Lite Paper, Anderson and Blox made materially false and misleading statements that water royalties were used to buy and burn DRIP, when in fact DEBT Box never used any water royalties to buy and burn DRIP and instead Anderson used investor funds to do so.

207. The DRIP Lite Paper, available on thedebtbox.com and disseminated to investors from at least the end of April 2023 through the end of the Relevant Period, stated, "D.E.B.T. digital tokens are supported by real-world commodities and services through royalties from projects which are used to purchase tokens out of the ecosystem through the blockchain to add stability with tangible revenues…. The D.E.B.T. ecosystem benefits from the token burns that occur from the purchase of tokens from project royalties received. These royalties are generated from real-world physical commodities, products and services."

208. The DRIP Lite Paper further stated, "[T]he DRIP project tokenomics are supported by three areas…. • Water royalties…." Of the areas that purportedly supported the DRIP project, water royalties were the only assets external to the DEBT Box ecosystem that could be used to create profits and affect the price of DRIP tokens.

**9. DCM - The Anderson Defendants Made Materially False and Misleading Statements that Royalties Were Used to Buy and Burn DCM.**

209. In a Lite Paper, Anderson and Blox made materially false and misleading statements that data center mining royalties were used to buy and burn DCM, when in fact

DEBT Box never used any data center mining royalties to buy and burn DCM and instead Anderson used investor funds to do so.

210. The DCM Lite Paper, available on thedebtbox.com and disseminated to investors from at least the end of July 2023 through the end of the Relevant Period, stated, "D.E.B.T. digital project tokens are supported by real-world commodities and services through royalties from each underlying ecosystem project. These royalties are used to purchase tokens out of the ecosystem through the blockchain to add stability and support to the project tokenomics. Projects in the D.E.B.T. ecosystem benefit from token burns, which occur when the trust uses project royalties to purchase tokens out of the ecosystem. These royalties are generated from real-world physical commodities, products, and services."

211. The DCM Lite Paper further stated, "Data centers are essential for modern digital communication, as they provide a secure and reliable infrastructure for storing, processing, and transmitting data. D.E.B.T.'s data centers plan to contribute to the following benefits….
5. Mining royalties: D.E.B.T. supported data centers will use royalties earned from data mining to purchase, vault, and burn DCM tokens out of the ecosystem. With diminished supply comes increased demand, thus potentially increasing the value of the token over time."

212. The DCM Lite Paper continued: "[T]he DCM project tokenomics are supported by three areas: •Data Center Mining royalties…." Of the areas that purportedly supported the DCM project, data center mining royalties were the only assets external to the DEBT Box ecosystem that could be used to create profits and affect the price of DCM tokens.

### 10. REV - The Anderson Defendants Made Materially False and Misleading Statements that Royalties Were Used to Buy and Burn REV.

213. In a Lite Paper, Anderson and Blox made materially false and misleading statements that vehicle-related royalties were used to buy and burn REV, when in fact DEBT Box never used any vehicle royalties to buy and burn REV and instead Anderson used investor funds to do so.

214. The REV Lite Paper, available on thedebtbox.com and disseminated to investors from at least the end of July 2023 through the end of the Relevant Period, stated, "D.E.B.T. digital project Tokens are supported by real-world commodities and services through royalties from each underlying ecosystem project. These royalties are used to purchase tokens out of the ecosystem through the blockchain to add stability and support to the project tokenomics. Projects in the D.E.B.T. ecosystem benefit from token burns, which occur when the trust uses project royalties to purchase tokens out of the ecosystem. These royalties are generated from real-world physical commodities, products, and services."

215. The REV Lite Paper further stated, "The REV Project is supported by royalties received from a variety of alternative, titleable asset classes such as cars, recreational vehicles, boats, and aircraft. Through D.E.B.T.'s partners, the project will use several different strategies that focus on leveraging lending strategies along with the appreciation and depreciation schedules, rental potential, and fractionalization of ownership of these motor classes to receive a portion of the royalties generated and put them toward buying and vaulting REV tokens out of the ecosystem."

216. The REV Lite Paper also stated, "the REV Project tokenomics are supported by three areas: • Alternative asset class royalties…." Of the areas that purportedly supported the REV project, alternative asset class royalties were the only assets external to the DEBT Box ecosystem that could be used to create profits and affect the price of REV tokens.

#### 11. The Statements About Revenue for Specific Projects Enumerated Above Were False and Misleading, Made with Scienter and Negligently, and Material.

217. A reasonable investor would have understood the statements alleged in this Section III.C, above, were statements of historic facts and facts at the time the statements were made that DEBT Box had received and was receiving royalty revenue from real-world projects and had used and was using those funds to buy and burn Project-Specific tokens in those projects, decreasing supply, and increasing value.

218. Each of the above representations regarding using royalties to buy and burn Project-Specific DEBT Box tokens alleged in this Section III.C, above, were false or misleading when made because, during the Relevant Period, DEBT Box never received royalties to buy and burn any Project-Specific tokens.

219. The Anderson Defendants omitted to state material facts that were necessary to render their statements regarding the use of royalties to buy and burn Project-Specific DEBT Box tokens not misleading. These omissions include that DEBT Box was not receiving and never did receive any royalties from real-world projects, did not use and never did use royalties to buy and burn Project-Specific tokens, and that the Anderson Defendants used investor funds to buy and burn Project-Specific tokens.

220. The Anderson Defendants knew or were reckless in not knowing, and should have known, that these statements and omissions about purported revenue were false and misleading because, among other things, the Anderson Defendants owned, controlled, and had authority over the intellectual property of the DEBT Box digital ecosystem, including any crypto asset wallets that would have ever received any real-world project royalties and used those royalties to buy and burn crypto assets, and the Anderson Defendants knew that no DEBT Box crypto asset wallets, which they controlled, ever received or used any royalties from any real-world commodity or royalty projects to buy and burn Project-Specific tokens during the Relevant Period.

221. In addition, Anderson's own messages with other DEBT Council members during the Relevant Period demonstrate his awareness that investor funds, not royalties, were used to buy and burn Project-Specific tokens. For example:

a. In a June 16, 2023, WhatsApp message, Anderson told the rest of the DEBT Council, "100% of full license sales need to go to token support **or this shit will claps [sic] on its self**. The budget was planned for royalties a year ago." (Emphasis added.)

b. Anderson messaged other members of the DEBT Council on July 21, 2022, stating, "We have a path to Binance.US by November as long as we bring in 1m a month in royalties from Oil. If not we will hit Binance in January with other outside liquidity coming in."

c. On November 11, 2022, Brannon stated to the group via WhatsApp text, "Now we have to hurry up and get the royalties going," and Anderson responded "… Yes please."

d. On March 18, 2023, Anderson discussed via WhatsApp with the DEBT Council financial modeling based off monthly revenue from projects and stated they missed modeling on BGLD and NATG due to lack of revenue.

222. The above misrepresentations and omissions regarding using royalties from real-world projects to buy and burn Project-Specific tokens were material to investors because a reasonable investor would consider it important that DEBT Box had not received revenue from real-world projects and would also consider it important that the value of DEBT Box crypto assets promised in the license agreements was not supported by revenue but, instead, the use of investor funds.

### D. The Anderson Defendants Obtained Money or Property, Directly or Indirectly, By Means of Materially False and Misleading Statements Alleged Above that Royalties Were Used to Buy and Burn DEBT Box Tokens.

223. The Anderson Defendants made the materially false and misleading statements alleged above in this Section III. They at the very least negligently obtained money or property by means of those statements.

224. During the Relevant Period, Blox received approximately $3,349,317 in investor funds because of the false and misleading statements alleged above.

225. During the Relevant Period, Relief Defendant Business Funding, a company solely owned and controlled by Anderson, received approximately $12 million in investor funds from DLI. From those funds, $4.1 million was sent to Anderson's personal bank accounts.

Business Funding received these funds because of the false and misleading statements alleged above.

226. In addition, of the approximate $129 million of investor funds in the form of crypto assets that were received into crypto asset wallets that Anderson controlled or had authority over, millions of dollars of investor funds were sent to over-the-counter crypto asset trading platforms and converted to cash. Anderson received control and authority over these funds because of the false and misleading statements described above.

227. Finally, approximately $8 million in Bitcoin (BTC) in investor funds was converted to cash, from which $2.75 million was sent to Anderson's personal bank accounts. Anderson received these funds because of the false and misleading statements above.

## IV. THE DLI DEFENDANTS OBTAINED MONEY OR PROPERTY BY MEANS OF FALSE AND MISLEADING STATEMENTS IN VIOLATION OF SECURITIES ACT SECTION 17(a)(2) (CLAIM III).

### A. The DLI Defendants Negligently Obtained Money or Property By Means of Materially False and Misleading Statements that Royalties Were Used To Buy and Burn Project-Specific Tokens.

228. Under the MOU, DLI hired Blox to provide educational materials to investors, including Lite Papers and Websites.

229. Brannon and Nelson received drafts of Lite Papers and were consulted on Lite Papers. Brannon reviewed and made specific edits to Lite Papers. Both were aware of the content of Lite Papers and Websites being disseminated to investors stating that royalties were being used to buy and burn tokens.

230. Further, Brannon and Nelson attended the January 14, 2023, X-Node conference and were present when Anderson said many of the oral representations alleged above in

paragraphs 146-148 and 176 about DEBT Box receiving royalties and using them to buy and burn Project-Specific tokens.

231. The DLI Defendants were responsible for the physical side of DEBT Box. Because of this, they should have known that no royalties were ever sent to DEBT Box that could be used to buy and burn Project-Specific tokens.

232. The DLI Defendants directly or indirectly obtained money or property by means of the false and misleading statements alleged above—that royalties were used to buy and burn Project-Specific tokens to increase their value.

233. During the Relevant Period and when the Lite Papers and Websites were disseminated to investors, DLI received approximately $26 million in investor funds. From those funds, Brannon received approximately $85,000 in October 2022 and June 2023, and Nelson received $100,025 in April 2023. DLI received these funds because of the false and misleading statements described above.

### B. Brannon and DLI Negligently Obtained Money or Property By Means of Materially False and Misleading Statements About Explore (XPLR) Technology.

234. Brannon and DLI obtained money or property by means of materially false and misleading statements about the Explore (XPLR) technology in the XPLR Lite Paper and oral representations about XPLR's remote sensing satellite technology.

235. The XPLR Lite Paper, which was made publicly available by mid-July 2022, stated:

a. "Explore, [sic] is a project that provides technology and services to various commodity suppliers around the world. Using advanced proprietary remote

sensing and satellite imagery technology, Digital Licensing, Inc., the platform's permissioned administrator, offers suppliers of raw materials the ability to create efficiencies throughout the exploration, extraction, refining and/or production processes of raw commodities."

b. "Explore holds the exclusive contractual rights of use from the proprietary technology provider for the remote sensing technology platform."

236. Brannon made the following statements, among others, while explaining the Explore technology to a group of investors and promoter representatives, and their discussion was posted to YouTube on November 15, 2022:

a. So a little bit of explanation, on the basics. So everything on the periodic table has a specific vibration to it. Right. Which has a certain frequency. Right. Don't quote me on this, but it's like gold has 7.482Hz. Right. That's what it that's what it resonates at. That's what it vibrates at. Right. All atoms vibrate. You vibrate, you vibrate, I vibrate. We all have our own signatures. All minerals or anything on the periodic table also has its own signature. So the question is, and part of what we're using here is proprietary software to us. And some of the satellite technology is not proprietary. It's available to anybody that wants to basically lease satellite time.

b. So, somebody asked me earlier, how long does it take you to do this? And it just depends. It varies from, we need the the the satellite pass over, right, for the scan to capture, using specific equipment on the satellite, the spectrometer. The metadata that's coming from the, the vibration or the frequency that's in the ground.

c. So, anyway, so what I was saying was that once you zero in and lock in on the frequency, you've got it. But then you've got to be able to to interpret that data and render it so that somebody a driller or a miner can action it. Right. And that's again part of what we, part of our proprietary side, is we've got specific techs, right. Surveyors that we've trained that can interpret the data and then say, okay, we're going to we're going to render these targets so that they're actionable from the people that are actually getting after particular resources.

237. A reasonable investor would have understood from the statements above that DLI, XPLR, or both had a remote sensing satellite technology that detected and interpreted vibrations or frequencies of elements in the ground that could be used to locate precious metals and hydrocarbons.

238. The statements regarding the Explore technology were false and misleading. The Explore technology did not use frequencies of elements to locate precious metals and hydrocarbons.

239. Contrary to that reality, the location service was performed by a human's purported psychic ability to sense frequencies or vibrations in photos or satellite images.

240. Brannon and DLI should have known that these statements were false and misleading because in the spring of 2022, the then-holder of the purported technology told Brannon that the "technology" consisted of her and her late father's psychic ability to sense vibrations and frequencies in photos and images.

241. The statements regarding the exclusive contractual right to this remote sensing technology were also false and misleading because neither DLI nor XPLR ever owned the exclusive contractual right to this technology. A company that Brannon and Nelson owned and controlled before the Relevant Period obtained an exclusive contractual right from another company to use this technology solely in Ghana, not the exclusive right to use this technology anywhere and everywhere. Thus, DLI never owned the exclusive contractual right to this purported technology.

242. Brannon had the power to act, and did act, on behalf of DLI and Brannon's actions and his state of mind are therefore imputed to DLI.

243. Brannon had received drafts of the XPLR Lite Paper and Brannon provided edits to it in July 2022, months after learning the claim from the technology provider that the "technology" was based on purported psychic ability.

244. A reasonable investor would have wanted to know that the holder of the remote sensing satellite technology told Brannon that the technology was based on purported psychic abilities. Brannon and DLI did not disclose this fact to investors.

245. Brannon and DLI used these statements to obtain money or property. From August through December 2022 (before the partnership with a new, real satellite company was announced in mid-January 2023), DLI's bank account received over $5 million in investor funds. From these funds, Brannon received $50,000. During this period, DLI sold XPLR license agreements.

## V. DEFENDANTS ENGAGED IN ADDITIONAL FRAUDULENT AND DECEPTIVE ACTS IN FURTHERANCE OF THEIR DECEPTIVE SCHEME IN VIOLATION OF EXCHANGE ACT SECTION 10(b) AND RULES 10b-5(a) AND (c) (CLAIM I - ANDERSON DEFENDANTS) AND SECURITIES ACT SECTIONS 17(a)(1) (CLAIM II – ANDERSON DEFENDANTS) AND 17(a)(3) (CLAIM III – ALL DEFENDANTS).

246. In addition to the false and misleading statements alleged above in Sections III and IV, Defendants engaged in additional deceptive conduct described below.

### A. Anderson and Blox Misused $101 Million of Investor Funds to Create the Illusion of Revenue, Redeem Investors, and Prop Up the Price of Tokens in Violation of Section 10(b) and Rules 10b-5(a) and (c) of the Exchange Act and Sections 17(a)(1) and (3) of the Securities Act.

247. During the Relevant Period, Anderson controlled or had authority over the crypto asset wallets that received approximately $129 million in investor funds in the form of crypto assets.

248. Anderson used approximately $101 million of investor funds – not revenues or royalties from real-world projects – to buy DEBT and Project-Specific tokens.

249. In addition to masking the absence of actual revenue, these purchases also deceptively propped up the price of DEBT and Project-Specific tokens.

250. DEBT Box actively sold new license agreements while Anderson and Blox created the illusion of revenue and deceptively propped up prices to bolster its promotion and sale of additional license agreements.

**1. Anderson misused investor funds disguised as revenue.**

251. Anderson and Blox used investor funds instead of revenue from real-world projects to buy DEBT and Project-Specific tokens on a nearly daily basis during the Relevant Period.

252. Anderson and Blox used approximately $101 million of investor funds to buy DEBT and Project-Specific tokens using liquidity pools as described above (*see supra* Section I.D).

253. Anderson and Blox used approximately $79 million of the $101 million of investor funds to buy and burn Project-Specific tokens. Anderson and Blox used the remaining $22 million to buy Project-Specific tokens they did not burn. Nearly all of the $22 million was deposited into liquidity pools to be withdrawn by investors.

254. As to the approximately $79 million of investor funds used to buy and burn Project-Specific tokens, Anderson and Blox first used investor funds to acquire DEBT tokens, and then used those DEBT tokens to buy Project-Specific tokens:

a. A crypto asset wallet identified as "DCH Payments Wallet (0xf4e5...e74e)" received proceeds from license agreement sales (*i.e.*, investor funds), both directly and indirectly, in the form of crypto assets valued at approximately $100 million;

b. Anderson and Blox transferred approximately $77.4 million of those investor crypto assets from the DCH Payments Wallet (0xf4e5...e74e) to a crypto asset wallet identified as the "Buy & Burn Wallet (0x525d...e98c)," and made similar transfers of investor funds to the Buy & Burn Wallet (0x525d...e98c) through other wallets totaling an additional $1.2 million;

c. Anderson and Blox acquired DEBT tokens in the Buy & Burn Wallet (0x525d...e98c) by using the investor crypto assets to buy the DEBT tokens;

d. Anderson and Blox then used the DEBT tokens to acquire Project-Specific tokens by using DEBT to buy Project-Specific tokens, such as ALUM, BGLD, or NATG; and

e. Anderson and Blox then sent the Project-Specific tokens from the Buy & Burn Wallet (0x525d...e98c) into the projects' various "burn wallets" without receiving any value in the Buy & Burn Wallet (0x525d...e98c).

255. The DCH Payments Wallet (0xf4e5...e74e) was not disclosed to investors or the public as a crypto asset wallet associated with DEBT Box. This crypto asset wallet received investor funds from a promoter who sold DEBT Box license agreements to investors. Nor was it disclosed to investors that Anderson and Blox controlled it or that this crypto asset wallet received proceeds from license agreement sales. This lack of disclosure obscured the source of

funds used to buy and burn tokens to help create the false impression that project revenue was used to buy and burn tokens.

256. Investor funds comprised a significant portion of the crypto assets used to buy DEBT in the largest and longest-active liquidity pool in which investors could sell their DEBT for external crypto assets (the DEBT-[BSC-USDC] Pool), reaching a high of 72% through January 2023 and accounting for 57% through the end of the Relevant Period.

257. Anderson and Blox, through the Buy & Burn Wallet (0x525d...e98c), were the largest by volume purchasers of Project-Specific tokens, ranging from 45% by USD value in the DEBT-DRIP liquidity pool to 69% in the DEBT-GROW liquidity pool.

258. As to the $22 million of investor funds that Anderson and Blox used to buy Project-Specific tokens that they did not then burn, this use was deceptive because it also supplied a material source of funds from which investors received redemptions.

259. Using investor funds, and not royalties, to buy DEBT provided a source of crypto assets that investors could redeem for external crypto assets and had the purpose and effect of Ponzi payments.

260. The way investors redeemed the value of their investments was to first sell their Project-Specific tokens for DEBT, and then sell that DEBT for external crypto assets.

261. Investors could then cash out their external crypto assets through crypto asset trading platforms.

262. In WhatsApp messages on June 16, 2023, with Brannon and Nelson, Anderson had the following exchange with Brannon:

> Anderson: … But bottom line there is no $ because it's all going to support tokens and has had too [sic] because a year of no royalties.

> We can't use a cent of it until $ starts flowing. It's around $200k a day in token support right now or 6m a month. Sales are around 3.5m a month and we are barely able to hang on…. **We are spending EVERY cent to support the beast because no $ coming in**. (All caps in original, emphasis added.)
>
> Brannon: We have to balance this Jason we can't just support tokens and not project or were [sic] dead….
>
> ….
>
> Anderson: **100% of full license sales need to go to token support or this shit will claps [sic] on its self**. The budget was planned for royalties a year ago…. (Emphasis added.)
>
> ….
>
> Brannon: I am not saying we don't support the coins or the ecosystem, but I want (we need) the 4 of us need to understand and be involved in the deployment of where these sales revenues and [sic] being deployed….
>
> ….
>
> Anderson: The budget was 1m in commission and per project and 1m – 2m for the actual project (in most cases) . . . the rest was always for token support until the royalties hit and then we all would have upside.

263. Using investor funds to buy tokens was a course of deceptive acts in furtherance of a deceptive scheme: When the Anderson Defendants disguised those purchases as revenue to buy and burn tokens, those acts gave the false appearance to investors that royalties were being used to buy and burn Project-Specific tokens.

264. Anderson and Blox knew or were reckless in not knowing, and should have known, that using investor funds to buy and burn Project-Specific tokens would create a false appearance to investors that royalties were being used to buy and burn Project-Specific tokens.

265. Investors would not have understood that $101 million of their funds would be used to buy DEBT and Project-Specific tokens and $79 million of that $101 million would be used to buy and burn Project-Specific tokens. Investors were told that their money would be used to support real-world projects, not be used as a substitute for revenue that was supposed to come from real-world projects. Investors were also told that royalties from real-world projects, not investor funds, would be used to buy and burn Project-Specific tokens.

266. The source of funds used to buy DEBT and used to buy and burn Project-Specific tokens was important to investors because the viability of the DEBT Box ecosystem and value of the Project-Specific tokens relied on that source of funds, and using investor funds for that purpose rather than royalties created a significant risk to the sustainability of DEBT Box.

267. Given Anderson's role at Blox, his actions and his state of mind are imputed to Blox for the conduct alleged in this Complaint.

**2. Anderson and Blox Propped Up the Price of DEBT and Project-Specific tokens.**

268. In addition to creating the illusion of revenue and the false perception of the success of the real-world projects, the Anderson Defendants artificially increased the price of DEBT and Project-Specific tokens by using investor funds to buy these tokens and by using investor funds to buy and burn Project-Specific tokens.

269. This was especially the case when many investors were seeking to sell their DEBT for external crypto assets like BSC-USDC, which would have pushed the price of DEBT down. But Anderson's and Blox's conduct artificially increased the price of DEBT and the price of Project-Specific tokens (or kept the prices higher than they otherwise would have been) when

they used the investor funds to buy DEBT and then used the DEBT to buy Project-Specific tokens.

270. Anderson and Blox increased the price of DEBT in a deceptive manner by funneling investor funds through the DCH Payments Wallet (0xf4e5...e74e) to purchase DEBT. As alleged above, that crypto asset wallet was not disclosed to investors or the public as a crypto asset wallet associated with DEBT Box.

271. Disguising the source of funds that Anderson and Blox used to purchase DEBT by funneling investor funds through this undisclosed crypto asset wallet created the deceptive appearance that the increase in the price of DEBT was attributable to natural market demand.

272. Because DEBT was the utility token through which investors redeemed all Project-Specific tokens and could swap for crypto assets with a USD value, such as BSC-USDC, the appearance of DEBT price increases attributable to natural market demand was attractive to potential license agreement purchasers.

273. Anderson and Blox artificially increased the price of DEBT and Project-Specific tokens in this manner, in part, to bolster their efforts to promote and sell more license agreements.

274. As one example, Anderson and Blox artificially increased the price of DEBT in a deceptive manner shortly before and after the X-Node Conference, the large investor conference in Salt Lake City hosted by DEBT Box and one its promoters on January 14, 2023.

275. Anderson and Blox carried out this part of their scheme by using three crypto asset wallets that were not disclosed to investors or the public as crypto asset wallets associated with DEBT Box or as crypto asset wallets controlled by Anderson and Blox: BLOX Lending

Wallet (0x1655…f28a), BLOX Lending Wallet (0x59e9...4857), and DCH Wallet (0x2b0e...48a2).

276. From January 4 until January 12, Anderson and Blox bought nearly $6.9 million worth of DEBT out of the DEBT-[BSC-USDC] pool, which comprised 66% of all DEBT purchases by USD value within that period. Netted against the DEBT sold into the pool during that period, their transactions resulted in a net of $1.3 million of DEBT bought out of the pool, resulting in an increase in the price of DEBT.

277. Anderson and Blox used investor funds (*i.e.*, proceeds from license agreement sales) in the form of BSC-USDC to make the large DEBT purchases from January 4 until January 12, 2023.

278. These large purchases of DEBT caused an increase in price from $21.28 on January 4 to $31.35 on January 12.

279. As alleged above, Anderson and Blox created the DEBT-[BSC-USDC] liquidity pool and provided over 99% of the liquidity for the pool. Because Anderson and Blox were liquidity pool providers, they could also withdraw the liquidity they provided by removing both DEBT and BSC-USDC as a pair at the same time. Reducing the liquidity would increase the impact of transactions on the price of tokens in the pool. In other words, if they first reduced the liquidity in the pool, Anderson and Blox would need to buy less DEBT to cause an increase in its price.

280. On January 13, 2023, the day before the X-Node Conference, Anderson and Blox removed approximately $1.8 million of liquidity from the DEBT-[BSC-USDC] liquidity pool by

removing both crypto assets as a pair. The amount removed was 25% of the total liquidity in the pool.

281. After Anderson and Blox withdrew $1.8 million in liquidity from the DEBT-[BSC-USDC] liquidity pool, Anderson and Blox bought more DEBT between January 13 and January 20, 2023:

a. Anderson and Blox, through BLOX Lending Wallet (0x59e9...4857), BLOX Lending Wallet (0x1655…f28a), DCH Wallet (0x2b0e...48a2), and the Buy & Burn Wallet (0x525d...e98c) bought approximately $6 million worth of DEBT, 54% of all such purchases by USD value in that time period. This resulted in a net of $680,000 more DEBT bought out of the pool than sold into the pool.

b. These large purchases of DEBT, when combined with the withdrawal of liquidity, helped to raise the price of DEBT to an all-time high in the week following the X-Node Conference.

282. Between January 21, 2023, and January 27, 2023, the price of DEBT dropped approximately 40% from about $38 to about $23.

283. During this period, Anderson and Blox, through several BLOX and DCH wallets, as well as the Buy & Burn Wallet (0x525d...e98c), sold the majority of DEBT, by USD value, into the pool during that period, approximately 59%. Different than in the preceding weeks, however, was that those crypto asset wallets bought only about $2.7 million DEBT out of the pool, markedly lower than in weeks prior. This reduction in buying DEBT out of the pool allowed for about $1.5 million more of DEBT to be sold into the pool, contributing to the downward trend of the price of DEBT during this period.

284. Anderson's and Blox's acts to artificially prop up the price of DEBT and the Project-Specific tokens were deceptive acts in furtherance of a deceptive scheme that gave the false appearance to investors that the higher price of these tokens was being set by natural market forces.

285. Anderson and Blox knew or were reckless in not knowing, and should have known, that these acts would give investors a false appearance about the value of DEBT and the Project-Specific tokens made available to investors through the DEBT Box license agreements that Defendants were selling at the time.

286. The appearance of natural market forces driving up the price of DEBT and the Project-Specific tokens would be important to a reasonable investor because those forces would signify a viable investment, not a risky investment where an insider manufactured price increases.

287. Given Anderson's role at Blox, his actions and his state of mind are imputed to Blox for the conduct alleged in this Complaint.

**3. The Anderson Defendants Misused Investor Proceeds by Commingling Proceeds from the Sale of License Agreements in Separate Projects.**

288. As alleged above, DEBT Box offered a menu of different projects that allowed investors to decide what industry to invest in without taking on the risk of others. For example, when purchasing a NATG license agreement, an investor understood that proceeds from the sale of the NATG license agreement would go to partners in the natural gas industry, not the aluminum or beverage industries. NATG license agreement purchasers also understood that any revenue from NATG partners would be used to benefit the NATG token, not ALUM or BEV.

289. The backend record-keeping processes of the DEBT Box digital ecosystem did not permit tracking license agreement sales by project because the backend record-keeping processes did not assign how much an investor paid for a specific license agreement to that agreement's record keeping. The Anderson Defendants knew or were reckless in not knowing, and should have known, that the backend record-keeping processes of the DEBT Box digital ecosystem did not permit tracking by each Project-Specific license agreement.

290. The Anderson Defendants commingled funds that belonged to separate projects. Commingling funds was a deceptive act in furtherance of a deceptive scheme. The Anderson Defendants knew or were reckless in not knowing, and should have known, that investors expected that projects would be separate and the money they invested would not be used to benefit a separate project for which they had no stake.

291. It would have been important for investors to know that their investments in any of the projects took on the risks of all the projects due to the commingling among the supposedly separate projects.

**B. Anderson and Blox Deceptively Obtained Controlling Amounts of DEBT and BGLD on a Preferential Basis Not Available to Investors in Violation of Section 10(b) and Rules 10b-5(a) and (c) of the Exchange Act and Sections 17(a)(1) and (3) of the Securities Act.**

292. To carry out and prolong the scheme alleged above, Anderson and Blox created the false appearance that no one person or group had preferential or special access to DEBT Box tokens.

293. To create that false appearance, Anderson and Blox represented in Lite Papers and Email Updates that DEBT Box was a "fair launch," which investors understood to mean that

all investors would have an equal opportunity to buy Project-Specific license agreements and tokens at the same time and at the same price as founders and insiders like Anderson and Blox.

294. The "fair launch" promoted by DEBT Box also indicated to investors that Anderson and Blox would not have preferential treatment in obtaining Project-Specific license agreements and tokens, including doing so before the public.

295. The DEBT Lite Paper, available on thedebtbox.com and disseminated to investors from at least May 2022 through the end of the Relevant Period, stated that "[t]his is not an Initial Coin Offering (ICO) project. This constitutes a fair launch protocol because 100% of the token must be mined." Other Lite Papers, including the ALUM, BGLD, NATG, and XPLR Lite Papers, made the same representation. The BEV, BLOX, DRIP, DCM, and REV Lite Papers stated, "This is not an Initial Coin Offering (ICO) project structure…. The [BEV, BLOX, DRIP, REV] Project constitutes a fair launch protocol …."

296. In a February 10, 2023, Email Update sent to investors, Anderson and Blox stated, "This is NOT an ICO where the owners/developers/early investors took a huge batch of tokens up front!"

297. DEBT was launched to the public on February 1, 2022. It was described in the DEBT Lite Paper, available around May 2022, as the "central support and utility token for the DEBT Box ecosystem." The DEBT Lite Paper further stated, "It will be the most widely paired and beneficial token of the project."

298. The DEBT Lite Paper made statements that DEBT would be gradually distributed on a basis where all users had the same opportunity to acquire DEBT.

a. The DEBT Lite Paper stated that DEBT would be distributed half to the DEBT Council for "project growth and liquidity for exchanges" and half to investors. The DEBT Lite Paper also stated that all DEBT available to be distributed to investors would be placed in the DEBT Piggy Bank Wallet (0x7C51…94B2).

b. The DEBT Lite Paper further stated that DEBT was created in 2021 and that 50% of the tokens available at creation were distributed in the first year, even though DEBT license agreements were not available to the public until February 1, 2022. It further stated, "Each subsequent year fifty percent (50%) of the remaining tokens will be distributed and continue in perpetuity until 50 million DEBT tokens have been distributed."

299. In 2021, 12.5 million DEBT tokens were distributed from the DEBT EGI pool to the DEBT Piggy Bank Wallet (0x7C51…94B2) and were then available to be withdrawn by license agreement owners to their private crypto asset wallets.

300. The 12.5 million DEBT tokens were the full amount of DEBT that was available to investors in 2021.

301. The DEBT license agreements were not available for sale to the public in December 2021 and January 2022, and no retail, public license agreement holders withdrew any DEBT from the Piggy Bank Wallet during that time.

302. Distributions from the DEBT Piggy Bank to license agreement owners show that Anderson and Blox, through BLOX Lending Wallet (0x1655…f28a), were the sole license agreement holder or held the overwhelming majority of DEBT license agreements in 2021 and January 2022.

303. On March 14, 2022, there were 13,749,891 DEBT tokens in the DEBT Piggy Bank Wallet (0x7C51…94B2) that were available to all license agreement holders in proportion to the number of license agreements they owned. On that date, Anderson and Blox, through BLOX Lending Wallet (0x1655…f28a) received 12,502,790.77 DEBT tokens from the DEBT Piggy Bank Wallet.

304. By March of 2022, BLOX Lending Wallet (0x1655…f28a), controlled by Anderson and Blox, held over 90% of all DEBT tokens in circulation.

305. To be entitled to these DEBT tokens, Anderson and Blox obtained license agreements and, through BLOX Lending Wallet (0x1655…f28a), accumulated DEBT tokens before the general public.

306. Indeed, to acquire that many DEBT tokens through genuine distributions to license agreement holders, Anderson and Blox, through BLOX Lending Wallet (0x1655…f28a), would have had to have been a license agreement holder in 2021, because there were not enough distributions from February 1, 2022 to March 14, 2022, for anyone to accumulate 12,502,790 DEBT from distributions.

307. Anderson and Blox's early access to DEBT license agreements gave them control of the market and an advantage over other investors.

308. As of August 16, 2023, 91.65% of all DEBT distributed by the DEBT Piggy Bank was distributed to the DEBT Council Wallet (0x6c29…38f0) (50%), BLOX Lending Wallet (0x1655…f28a) (34%), and BLOX Lending Wallet (0x59e9…4857) (8%), each controlled by Anderson and Blox. Anderson's and Blox's control over these crypto asset wallets was not disclosed to the public. The DEBT Council Wallet address was disclosed publicly around May

2022 in the DEBT Lite Paper, but was not disclosed in March 2022 when DEBT distributions started taking place.

309. Anderson's and Blox's actions of owning DEBT license agreements before the license agreements were available to the public and their accumulation of over 90% of DEBT tokens was contrary to the perception they created that all investors had the same opportunity as DEBT Box founders to acquire DEBT Box crypto assets. This was not a "fair launch" as that term was used by Anderson, Blox, and DEBT Box.

310. In addition, in December 2021, before BGLD license agreements were made available to investors, Anderson and Blox received free BGLD tokens from the DEBT Box ecosystem that they used to buy BGLD license agreements and acquired more free BGLD tokens as a result.

311. Anderson's and Blox's early and undisclosed accumulations of large amounts of DEBT and BGLD tokens were deceptive acts in furtherance of a deceptive scheme that gave Anderson and Blox an unfair control of the DEBT and BGLD tokens, contrary to their representations of a fair launch.

312. Anderson and Blox knew or were reckless in not knowing, and should have known, that they secretly obtained DEBT and BGLD license agreements, tokens, or both contrary to their fair launch representations and that doing so would give investors a false appearance of a fair launch.

313. It would be important to a reasonable investor that DEBT and BGLD tokens were not distributed under a fair launch and, as a result, they were more susceptible to manipulations

and schemes of insiders than they would have been if DEBT Box distributed tokens under a fair launch.

### C. The DLI Defendants Misused Investor Proceeds to Pay Third-Party Companies, Which Had No Obligations to Pay Royalties to DEBT Box, in Violation of Section 17(a)(3) of the Securities Act.

314. As detailed below, Brannon, Nelson, and DLI used investor proceeds to pay third-party companies that Brannon and Nelson owned at least a part of without obtaining any obligations, services, goods, or other consideration, including the payment of royalties, to DEBT Box in exchange.

315. From September 2022 through June 2023, DLI, which was controlled by Brannon and Nelson, paid an oil and gas drilling company ("Drilling Company") $1,625,189 of investor funds from DLI's bank accounts to buy oil rigs and engage in drilling operations. Brannon owned at least a part of Drilling Company at the time Drilling Company received these funds.

316. Drilling Company owed no obligation to pay DEBT Box any royalties or any other type of payment for receiving these investor funds.

317. From February through May 2023, the DLI Defendants paid an energy company ("Energy Company") $496,000 of investor funds from DLI's bank accounts, purportedly, in part, as a loan to Energy Company. Brannon and Nelson, through their company The Gold Collective, LLC, owned Energy Company at the time Energy Company received these funds; and later, in April 2023, The Gold Collective assigned its whole ownership to Nelson, who completely owned Energy Company as of April 2023 when it received these funds.

318. During the Relevant Period, Energy Company executed no agreements to pay DEBT Box any royalties or any other type of payment for receiving these investor funds.

319. From November 2021 through May 2023, the DLI Defendants paid $4,068,494.93 of investor funds from DLI's bank accounts to The Gold Collective. Brannon and Nelson owned and controlled the Gold Collective through another company they owned and controlled. The Gold Collective owed no obligations to pay DEBT Box any royalties or any other type of payments for receiving these investor funds or provided any known goods or services.

### D. Brannon and DLI Failed to Correct False and Misleading Statements Alleged Above in Certain Lite Papers that Brannon Helped Prepare in Violation of Section 17(a)(3) of the Securities Act.

320. Brannon received emailed drafts of the Lite Papers for BGLD, XPLR, ALUM, and DLG. He edited these Lite Papers and failed to correct, and, in some cases affirmatively added words to, the false and misleading statements about royalties being used to buy and burn Project-Specific tokens.

321. On or around May 1, 2022, Brannon emailed Anderson, Nelson, and others his edits to the BGLD Lite Paper. In that draft he failed to correct the following false and misleading statements that remained in identical or similar form in the final, publicly available BGLD Lite Paper posted on thedebtbox.com in May 2022 and that was disseminated to investors:

a. "The Debt Box eco-system benefits from the physical production of these commodities by supporting real world project that generate revenues."

b. "A percentage of revenue generated from vetted and approved oil well projects, by the DEBT Counsel [sic] will be converted to (BGLD) tokens and sent to the burn wallet, never to be seen again. With revenues coming from multiple oil projects in various jurisdictions on multiple continents (BGLD) will continually being taken out of the market driving the Token price higher."

322. On or around June 30, 2022, Brannon emailed Anderson, Nelson, and others his edits to the DLG Lite Paper. In that draft he failed to correct and affirmatively added the word "ongoing" to the following false and misleading statement: "The D.E.B.T. Box ecosystem benefits from physical production of these commodities by supporting real-world projects that generate *ongoing* revenues." (Emphasis added.) That statement remained in identical form in the final, publicly available DLG Lite Paper posted on thedebtbox.com in July 2022 and that was disseminated to investors.

323. On or around July 1, 2022, Brannon emailed Anderson, Nelson, and others his edits to the XPLR Lite Paper. In that draft he failed to correct the following false and misleading statements and added the words that appear in italics below:

a. "Explore (XPLR) works closely with *developers, operators and land owners within the raw* commodity-based industry *and exchanges valuable exploration* data generated through a wide array of carefully curated technologies, including, but not limited to, proprietary remote sensing, satellite imaging technology, 3-D rendering, target drilling, geo-chemical analysis, assays, and other *valuable* earth science processes *for a portion of or the right to share additional commodity production from the project to the D.E.B.T. Box platform ecosystem*. The comprehensive reports generated provide *development and operational* partners with the ability to accurately estimate *and increase* recoverable natural resources, *enhancing the raw commodity* production feasibility and *contribute to* other factors that lead to increased production of the raw materials *being sought*.

b. "For this *technically advanced* service *approach*, Digital Licensing, Inc. *negotiates a portion of the increased production in the form of* a royalty *stream* from each partner's commodity-based industry project. By generating increased production, which didn't previously exist for a given raw material, and exchanging that newly created value, DLI is able to support the limiting of XPLR token supply over time *by utilizing its smart contract to direct these royalty stream payments through the XPLR Trust Fund to perpetually purchaser* [sic] *XPLR rewards from the secondary market and burn these tokens never to be seen again hence increasing the value of software license holders wallets by limited* [sic] *the supply of XPLR (Deflationary tokenomics)*. Explore brings access to *increased* tangible raw materials that the world needs while rewarding XPLR software *digital* mining license holders."

324. These statements remained in nearly identical or similar form in the final, publicly available XPLR Lite Paper posted on thedebtbox.com in July 2022 and that was disseminated to investors.

325. On or around July 6, 2022, Brannon emailed Anderson, Nelson, and others his edits to the ALUM Lite Paper. In that draft he failed to correct the following false and misleading statements and added the words that appear in italics below:

a. "*In exchange* for this technically advanced service, Digital Licensing, Inc. negotiates a portion of the increased production in the form of a royalty stream from each =commodity-based project. By generating increased production, which did *not* previously exist for *the* given raw material, and *by* exchanging that newly

> created value, DLI is able to support the limiting of ALUM token supply over time. This is done by utilizing the ALUM smart contract to direct the royalty stream payments through the ALUM Trust Fund to perpetually purchase ALUM rewards from the secondary market and burn these tokens never to be seen again. True to deflationary tokenomics, by removing *or burning* the*se* tokens, the value of *the other* token holders' wallets increases."

326. These statements remained in identical or similar form in the final, publicly available ALUM Lite Paper posted on thedebtbox.com in July 2022 and that was disseminated to investors.

327. Brannon's intricate involvement, substantial participation, and failure to correct these false and misleading statements were deceptive acts in furtherance of the deceptive scheme.

328. Brannon, as a principal of DLI, had the power to act and did act on behalf of DLI and acted as its agent, and thus his actions alleged herein as well as his state of mind, are imputed to and attributable to DLI.

329. Brannon and DLI should have known that being intricately involved and substantially participating in the crafting of, and failing to correct, false and misleading statements would give investors a false appearance that DEBT Box was receiving royalties and using them to buy and burn Project-Specific tokens.

### E. Nelson and DLI Disseminated False and Misleading Statements in Violation of Section 17(a)(3) of the Securities Act.

330. On January 18, 2022, Nelson emailed a link to an investor with the website blackgoldrewards.com, which contained the false and misleading statements alleged above in Section III.

331. Nelson's dissemination of false and misleading statements, which he should have known were false and misleading, was a deceptive act in furtherance of a deceptive scheme.

332. Nelson, as a 50% owner, treasurer, secretary, and board member of DLI, had the power to act and did act on behalf of DLI and acted as its agent, and thus his actions alleged herein as well as his state of mind, are imputed to and attributable to DLI.

333. Nelson and DLI should have known that disseminating false and misleading statements would give investors a false appearance that royalties or revenue from the production and sale of oil were being used to buy and burn BGLD.

### F. Nelson and DLI Propped Up the Price of DLG in Violation of Section 17(a)(3) of the Securities Act.

334. Nelson had access to and controlled crypto asset wallet address 0xc663…1974, referred to as the "Metals Wallet."

335. Between at least April and May 2023, Nelson used the Metals Wallet to make thousands of swaps of DEBT for DLG that had the effect of artificially keeping the price of DLG higher than it otherwise would have been. These acts were deceptive because they created a false impression of the demand for DLG, which was attractive to DLG license agreement purchasers.

336. For example, on April 8, 2023, the Metals Wallet engaged in 184 transactions in which Nelson swapped a total of 890 DEBT (approximately $7,400 USD) for DLG. The price of DLG increased from $41.98 to $61.47 during the time of those trades.

337. Nelson engaging in numerous DEBT for DLG transactions using the Metals Wallet was a deceptive act in furtherance of a deceptive scheme.

338. Nelson, as a 50% owner, treasurer, secretary, and board member of DLI, had the power to act and did act on behalf of DLI and acted as its agent, and thus his actions alleged herein as well as his state of mind, are imputed to and attributable to DLI.

339. Nelson should have known that using DEBT to buy DLG over so many transactions would give investors a false appearance of natural market demand that caused DLG's price to increase. This was a deceptive act in furtherance of a deceptive scheme to sell additional license agreements.

## VI. RELIEF DEFENDANT RECEIVED PROCEEDS FROM DEFENDANTS' FRAUD TO WHICH IT HAS NO LEGITIMATE CLAIM (CLAIM IV).

340. As alleged above, Relief Defendant Business Funding received proceeds from Defendants' fraud for which it provided no reciprocal goods or services, and to which it has no legitimate claim. As a result, those funds should be returned to defrauded investors.

## CLAIMS FOR RELIEF

### First Claim for Relief
**Section 10(b) and Rule 10b-5(a), (b), and (c) of the Exchange Act**
(Anderson and Blox)

341. The SEC realleges and incorporates by reference in this claim for relief the allegations in paragraphs 1-227 and 246-340 above.

342. Anderson and Blox, directly or indirectly, in connection with the purchase or sale of a security, and by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, knowingly or recklessly: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

343. By engaging in the conduct described above, Anderson and Blox violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(a), (b), and (c) thereunder, 17 C.F.R. § 240.10b-5(a), (b), and (c).

## **Second Claim for Relief**
## **Section 17(a)(1) of the Securities Act**
(Anderson and Blox)

344. The SEC realleges and incorporates by reference in this claim for relief the allegations in in paragraphs 1-227 and 246-340 above.

345. Anderson and Blox, directly or indirectly, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails, knowingly or recklessly employed devices, schemes, or artifices to defraud.

346. By engaging in the conduct described above, Anderson and Blox violated, and unless restrained and enjoined will continue to violate, Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a).

**Third Claim for Relief**
**Sections 17(a)(2) and (a)(3) of the Securities Act**
(All Defendants)

347. The SEC realleges and incorporates by reference in this claim for relief the allegations in paragraphs 1 to 340 above.

348. Anderson, Brannon, Nelson, Blox, and DLI, directly or indirectly, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails, at the very least negligently: (a) obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (b) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

349. By engaging in the conduct described above, Anderson, Brannon, Nelson, Blox, and DLI, violated, and unless restrained and enjoined will continue to violate, Sections 17(a)(2) and (a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(2) and (3).

**Fourth Claim for Relief**
**Disgorgement from Relief Defendant Business Funding**

350. The SEC realleges and incorporates by reference in this claim for relief the allegations in paragraphs 1 to 340 above.

351. Relief Defendant Business Funding obtained money, property, and assets that are the proceeds, or are traceable to the proceeds, of the fraud and violations of the securities laws by Defendants.

352. Relief Defendant Business Funding has no legitimate claim to these illicit proceeds or assets, having obtained the funds under circumstances in which it is not just,

equitable, or conscionable for it to retain the funds or assets, and therefore it has been unjustly enriched.

**PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that the Court enter a Final Judgment that:

1. Finds that Defendants committed the violations alleged in this Complaint;

2. Permanently restrains and enjoins, in a form consistent with Rule 65 of the Federal Rules of Civil Procedure, Anderson and Blox and their agents, servants, employees, attorneys, and accountants, and those persons in active concert or participation with them, who receive actual notice of the Final Judgment by personal service or otherwise, and each of them, from engaging in transactions, acts, practices, and courses of business described herein, and from engaging in conduct of similar purpose and object in violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), Exchange Act Rule 10b-5, 17 C.F.R. § 240.10b-5, and Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1);

3. Permanently restrains and enjoins, in a form consistent with Rule 65 of the Federal Rules of Civil Procedure, Defendants, and their agents, servants, employees, attorneys, and accountants, and those persons in active concert or participation with them, who receive actual notice of the Final Judgment by personal service or otherwise, and each of them, from engaging in transactions, acts, practices, and courses of business described herein, and from engaging in conduct of similar purpose and object in violation of Sections 17(a)(2) and (a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(2), (a)(3);

4. Permanently restrains and enjoins, in a form consistent with Rule 65 of the Federal Rules of Civil Procedure, Anderson from directly or indirectly, including, but not limited

to, through any entity owned or controlled by him, participating in the issuance, purchase, offer, or sale of any security, provided, however, that such injunction shall not prevent him from purchasing or selling securities for his own personal accounts;

5. Permanently restrains and enjoins, in a form consistent with Rule 65 of the Federal Rules of Civil Procedure, Brannon and Nelson from directly or indirectly, including, but not limited to, through any entity owned or controlled by them, participating in the issuance, purchase, offer, or sale of any security for two years, provided, however, that such injunction shall not prevent them from purchasing or selling securities for their own personal accounts;

6. Orders Anderson, Blox, Brannon, Nelson, and Relief Defendant to disgorge ill-gotten gains received during the period of violative conduct and pay prejudgment interest on such ill-gotten gains, pursuant equitable principles and Exchange Act Sections 21(d)(3), (d)(5), and (d)(7), 15 U.S.C. §§ 78u(d)(3), 78u(d)(5), 78u(d)(7);

7. Orders Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and with respect to Defendants Anderson and Blox, Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3); and

8. Grants such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

The SEC demands a trial by jury on all claims so triable.

Dated: October 28, 2026

Respectfully submitted,

By: *s/ Terry R. Miller*

Terry R. Miller
U.S. Securities and Exchange Commission
1961 Stout Street, Suite 1700
Denver, CO 80294-1961
Telephone: 303-844-1041 (Miller)
303-844-1000 (Main)
Email: millerte@sec.gov

*Attorney for Plaintiff*
*U.S. Securities and Exchange Commission*